

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-31-2003

# Spinetti v. Service Corp

Precedential or Non-Precedential: Precedential

Docket 01-4415

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Spinetti v. Service Corp" (2003). *2003 Decisions.* Paper 672.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/672

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed March 31, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-4415

MARYANN SPINETTI,

Appellant

v.

SERVICE CORPORATION INTERNATIONAL AND SERVICE
CORPORATION INTERNATIONAL OF PENNSYLVANIA
d/b/a LAFAYETTE MEMORIAL PARK

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 01-CV-1191)
District Judge: The Honorable Donetta W. Ambrose

Argued: January 14, 2003

Before: ROTH, FUENTES and ALDISERT, *Circuit Judges*

(Filed: March 31, 2003)

SAMUEL J. CORDES (Argued)
Ogg, Cordes, Murphy & Ignelzi
245 Fort Pitt Boulevard
Pittsburgh, PA 15222

ATTORNEY FOR APPELLANT

NICHOLAS M. INZEO, Acting Deputy
  General Counsel
PHILIP B. SKLOVER, Associate
  General Counsel
LORRAINE C. DAVIS, Assistant
  General Counsel
SUSAN R. OXFORD, Attorney
  (Argued)
Equal Employment Opportunity
  Commission
1801 L Street, NW
Washington, D.C. 20507

   AMICUS CURIAE in support of the
   Appellant

RICHARD J. ANTONELLI
ROBERT W. PRITCHARD (Argued)
Littler Mendelson, P.C.
Dominion Tower
625 Liberty Avenue, 26th Floor
Pittsburgh, PA 15222

   ATTORNEYS FOR APPELLEES

---

## OPINION OF THE COURT

ALDISERT, *Circuit Judge*:

This appeal by an employee from a district court order compelling arbitration of her employment discrimination claims requires us to determine whether the entire arbitration agreement between her and her employer was vitiated when the court voided the agreement's attorney's fees and arbitration costs provision for offending federal statutes and ruling case law. After making the excisions, the court ordered the discrimination issues to arbitration. We affirm.

### I.

At tension here are two important expressions of public policy. We must respect the "liberal federal policy favoring

arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), illustrated by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. Yet, we must face the equally strong policies of (1) invalidating arbitration agreements when "large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum[,]" *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90 (2000), and (2) permitting the award of attorney's fees to a prevailing party pursuant to Title VII, 42 U.S.C. § 2000e-5(k), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 626(b), 216(b).

The federal policy encouraging recourse to arbitration requires federal courts to look first to the relevant state law of contracts, here Pennsylvania, in deciding whether an arbitration agreement is valid under the FAA. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Pennsylvania courts have held that if an *essential* term of a contract is deemed illegal, it renders the entire contract unenforceable by either party. *Diebler v. Chas. H. Elliot Co.*, 81 A.2d 557, 560-561 (Pa. 1951) (stating that a bilateral bargain containing both a legal and illegal promise may not be enforced when the illegal portion is the essential consideration for the bargain).

In light of the pro-arbitration federal policy and Pennsylvania contract law, we believe that the make-or-break task before us is to decide whether the stricken portion of the employment arbitration agreement constitutes "an essential part of the agreed exchange" of promises. RESTATEMENT (SECOND) OF CONTRACTS § 184(1) (1981). We conclude that it does not.

"The essence of the [disputed] contract . . . is an agreement to settle . . . employment disputes through binding arbitration." *Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677, 681 (8th Cir. 2001). Accordingly, we agree with the district court that "[t]he provisions regarding payment of arbitration costs and attorney's fees represent only a part 'of [the] agreement and can be severed without disturbing the primary intent of the parties to arbitrate their disputes.'" *Spinetti v. Serv. Corp. Int'l*, No. 01-11911, 13 (W. D. Pa. Nov. 15, 2001) (opinion and order of court)

[hereinafter D. Op.] (quoting *Gannon*, 262 F.3d at 681). You don't cut down the trunk of a tree because some of its branches are sickly.

## II.

Appellant Maryann Spinetti began working for Service Corporation International ("SCI") as a sales counselor on April 10, 1989. On May 29, 1997, SCI presented Spinetti with a document described as a "new personnel policy," but labeled "Principles of Employment" ("Agreement"). The employer told Spinetti to sign the Agreement in order to acknowledge receipt. After a cursory review, she signed the document, and both parties became bound by it.

Her employment was terminated on or about October 23, 2000. The circumstances underlying the termination are irrelevant to the issue on appeal, but essentially involve allegations that Spinetti engaged in inappropriate conduct including treating staff abusively, throwing an object at a co-worker and using vulgar language. She subsequently filed this lawsuit alleging that SCI terminated her employment because of her age and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the ADEA, 29 U.S.C. §§ 621 *et seq.* SCI moved to dismiss the complaint and compel arbitration.

Before the district court, Spinetti contended that the arbitration agreement was not enforceable because it prevented her from fully and effectively vindicating her ADEA and Title VII rights. She grounded this argument in the *Legal Counsel/Costs* provision of the arbitration agreement which required: (1) that each party pay its own costs and attorney's fees, regardless of the outcome of the arbitration; and (2) that each party pay one-half of the compensation to be paid to the arbitrator(s), as well as one-half of any other costs relating to the administration of the arbitration proceeding. Agreeing with Spinetti that these requirements offended ruling case law and federal statutes, the district court severed the attorney's fee and costs provision from the arbitration agreement. However, the district court also granted SCI's motion to dismiss, and compelled the parties to proceed to an arbitration which

was to be governed by the remaining provisions of the agreement, relevant case law and the statutory guidelines of Title VII and ADEA. Spinetti appeals the district court's determination and argues that inasmuch as the attorney's fees and costs provision is deemed contrary to law, the court should have voided the entire arbitration agreement instead of merely trimming its offensive portions.

The district court had jurisdiction pursuant to 28 U.S.C. § 1331, and converted the Appellee's Motion to Dismiss and Compel Arbitration into a Motion for Summary Judgment. It granted Appellee's Motion, ordered the parties to proceed with arbitration and instructed the court clerk to mark the case closed. This decision is final within the meaning of FAA, 9 U.S.C. § 16(a)(3), and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291. *Green Tree*, 531 U.S. at 89 (holding that an order compelling arbitration and dismissing all other claims is final and immediately appealable); *Blair v. Scott Specialty Gases*, 283 F.3d 595, 602 (3d Cir. 2002) (same). Appellant filed a timely appeal. We review the grant of summary judgment de novo. *Id.* at 602-603.

## III.

The Agreement was designed to resolve employment-related disputes between SCI and its employees through arbitration rather than courtroom litigation. With limited exclusions, not applicable here, the Agreement stated that "all disputes relating to any aspect of Employee's employment with the Company shall be resolved by binding arbitration," including claims brought by the employee against SCI and claims by SCI against the employee. Agreement from SCI Central Region on *Principals of Employment*, Form: P44, 1. The Agreement directs that an Arbitrator shall apply the statutes, rules or regulations governing arbitrations in the state in which the employee is or most recently was employed by SCI — in this case, Pennsylvania. Absent such guidance, the Agreement provided, the arbitration proceedings shall be conducted in accordance with the employment arbitration rules of the American Arbitration Association. "In the event of any inconsistency between [the] Agreement and the statutes,

rules or regulations to be applied, the terms of the Agreement shall apply." *Id.* at 3.

Most notably, the Agreement contains the following provision relating to legal fees and arbitration costs:

¶4. *Legal Counsel/Costs*

Each party may retain legal counsel and shall pay its own costs and attorney's fees, regardless of the outcome of the arbitration. Each party shall pay one-half of the compensation to be paid to the arbitrator(s), as well as one-half of any other costs relating to the administration of the arbitration proceeding (e.g., room rental, court reporter, etc.)

*Id.* at 2. The Agreement has no severability clause and provides that no provision pertaining to arbitration may be modified except by a written agreement signed by both employee and the company.

## A.

The district court properly determined that the proviso requiring each party to pay its own attorney's fees — regardless of the outcome of the arbitration — runs counter to statutory provisions under Title VII and ADEA that permit an award of attorney's fees and costs to a prevailing party. 42 U.S.C. § 2000e-5(k); 29 U.S.C. §§ 626(b), 216(b); *see also Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 417 (1978) (holding that under Title VII it is clear that "a prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances"). It is well established that arbitration is merely a choice of dispute resolution and does not infringe upon statutory protections. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.*, 473 U.S. 614, 628 (1985). Therefore, "[i]f arbitration is to offer claimants the full scope of remedies available under Title VII, arbitrators in Title VII cases, just like courts, must be guided by *Christiansburg* and must ordinarily grant attorney fees to prevailing claimants" rather than be restricted by private contractual language. *Morrison v.*

*Circuit City Stores, Inc.*, 2003 WL 193410, \*20 n.15 (6th Cir. Jan. 30, 2003).[1]

## B.

The court then embarked on a fact-specific inquiry into whether the arbitration costs facing Spinetti offended the policy mandating that "[t]he arbitration of statutory claims . . . be accessible to potential litigants as well as adequate to protect the rights in question so that arbitration, like the judicial resolution of disputes, will further broader social purposes." *Morrison*, 2003 WL 193410, \*20, *quoting Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991). We are satisfied that the district court's analysis properly

1. Appellees submit an alternative basis for affirming the district court's decision. They argue that the arbitrator, and not the court, should have been first to consider Spinetti's challenge to the attorney's fee provision. A cross-appeal on this issue was not filed. Although an appellee can seek affirmance for reasons other than those given by the district court, this particular contention — arguing that the court did not have jurisdiction over the basic issue on appeal — is a frontal attack on the decision, necessitating a cross-appeal to join the issue.

Nevertheless, two glaring flaws adulterate Appellee's argument. First, SCI contends that our holding in *Great Western Mortgage Corp. v. Peacock*, 110 F.3d 222 (3d Cir. 1997) mandates that the district court should have deferred Spinetti's challenge to the arbitrator. This is, in a word, wrong. In *Blair*, we examined the scope of inquiry for district courts evaluating arbitration agreements. We said that "*Great Western* held that the question of whether the arbitration agreement validly waived certain rights afforded by [state] law could be presented in the arbitral forum, but also evaluated that claim on the merits and concluded that the claimant had not demonstrated any [state] policy against arbitration. Because *Great Western* did not foreclose the ability of courts to examine public policy arguments, it is not in conflict with the [Supreme Court] in *Green Tree*," 283 F.3d at 611 (citations omitted). Second, SCI argues that its Agreement would not preclude awarding of attorney's fees because it must be read in a manner consistent with federal law. Such after-the-fact recognition of the mandates of Title VII and ADEA is inconsequential when employees are faced with an Agreement that reads "[e]ach party . . . shall pay its own attorney's fees, regardless of the outcome of the arbitration" and "[i]n the event of any inconsistency between this Agreement and the statutes . . . the terms of this Agreement shall apply."

followed the "case-by-case" teachings of *Green Tree* on how to decide if a cost-splitting provision in an arbitration agreement denies potential litigants the opportunity to vindicate their statutory rights.

A party seeking to invalidate an arbitration agreement because arbitration would be prohibitively expensive bears the burden of showing this likelihood. *Green Tree*, 531 U.S. at 92. Although "*Green Tree* does not provide us with a standard for how detailed the showing of prohibitive expenses must be to support the conclusion that the provision, at minimum, is unenforceable," several courts have taken a stab at outlining the proper formula. *Morrison*, WL 193410 at *5 (quotation omitted) (holding that potential litigants must be given the opportunity to demonstrate that potential costs are great enough to deter them and similarly situated individuals from seeking to vindicate their federal statutory rights); *see also Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 556 (4th Cir. 2001) (stating that the appropriate inquiry is one that focuses on the claimant's ability to pay the arbitration fees and costs and whether these are substantial enough to deter the bringing of claims). We conclude that the district court adequately determined that Spinetti met her burden.

Spinetti was required to pay an initial, non-refundable filing fee of $500 to the American Arbitration Association, an additional filing fee of $2,750, a case-filing fee of $1,000, an additional charge of $150 for each day of the hearing and half the cost of an arbitrator. Evidence disclosed that a mid-range arbitrator in Western Pennsylvania charges approximately $250 an hour with a $2,000-per-day minimum.

Although Spinetti was earning $63,000 a year when employed by SCI, she was unemployed for six months following her termination. When she found new employment she says she was earning less than $300 per week while her monthly expenses for food and rent totaled approximately $2,000. To cover the deficit between income and expenses, Spinetti had taken cash advances from her credit cards. On the basis of this record, the district court determined "that Spinetti has adequately demonstrated that

the costs associated with arbitrating her claims are prohibitive." D. Op. at 10.

We make clear what was implicit in the district court's order to compel arbitration, to-wit, the court intended that the employer pay all costs of arbitration and final responsibility for attorney's fees should be governed by the appropriate statute — be it either Title VII or ADEA. Logically, within the rubric of a disjunctive "either-or" proposition, no other alternative can be inferred. The disjuncts are that the employer or employee or both, must pay. Because the court ruled out the employee on the basis that she could not afford to pay, *ergo*, the employer must. *See, e.g., Giordano v. Pep Boys—Manny, Moe & Jack, Inc.*, 2001 WL 484360 (E.D. Pa. Mar. 29, 2001) (holding that, because the plaintiff could not, the defendant was to bear the costs of arbitration in addition to the filing fees in excess of the cost of filing a complaint in federal court).[2]

---

2. Again, Appellee challenges this determination by the district court, and again, because SCI did not cross-appeal, the issue is not properly before us. Nevertheless, we offer some observations. The district court's case-specific analysis and subsequent determination that Spinetti lacked the ability to bear the costs of arbitration was adequate under the teaching of *Green Tree*. Moreover, SCI's offer to pay the costs of arbitration upon proof that compelling Spinetti to pay her costs would be prohibitively expensive is an after-the-fact offer and will be treated as such. The Court of Appeals for the Sixth Circuit cogently explained:

> In considering the ability of plaintiffs to pay arbitration costs under an arbitration agreement, reviewing courts should not consider after-the-fact offers by employers to pay the plaintiff's share of the arbitration costs where the agreement itself provides that the plaintiff is liable, at least potentially, for arbitration fees and costs. The reason for this rule should be obvious. Our concern is that cost-splitting provisions will deter potential litigants from bringing their statutory claims in the arbitral forum. When the cost-splitting provision is in the arbitration agreement, potential litigants who read the arbitration agreement will discover that they will be liable, potentially, for fees if they bring their claim in the arbitral forum and thus may be deterred from doing so. Because the employer drafted the arbitration agreement, the employer is saddled with the consequences of the provision *as drafted*. If the provision, as drafted, would deter potential litigants, then it is unenforceable, regardless of whether, in a particular case, the employer agrees to pay a particular litigant's share of the fees and costs to avoid such a holding. *Morrison* at *23.

Our analysis must now turn to the federal policy favoring arbitration.

## IV.

Congress enacted the FAA "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Gilmer*, 500 U.S. at 24. Section 2 specifically provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Act has been interpreted to possess the primary purpose of enforcing private contractual agreements to arbitrate. *See, e.g.*, *Mitsubishi*, 473 U.S. at 625-626; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). To that end, the Act provides that where a party to an arbitration agreement fails, neglects, or refuses to submit a matter to arbitration, the other party may seek to compel arbitration. 9 U.S.C. § 4.

In *Gilmer*, the Court upheld an arbitration agreement of a claim under the ADEA and stated that the statutory substantive rights are unaffected by the choice of dispute resolution. 500 U.S. at 26. The Court further noted that "[s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Id.* at 28 (quoting *Mitsubishi*, 473 U.S. at 637).

Following *Gilmer*, federal courts continually enforced arbitrations of employment-discrimination claims under Title VII as well as under the ADEA. *See, e.g.*, *Gannon*, 262 F.3d at 683 (Title VII); *Austin v. Owens-Brockway Glass Container, Inc.*, 78 F.3d 875, 882 (4th Cir. 1996), *cert. denied*, 519 U.S. 980 (1996) (Title VII and ADEA); *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1487 (10th Cir. 1994) (Title VII).

Finally, in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001), the Court resolved any lingering question concerning the FAA's applicability to arbitration agreements in the employment context. It held that with a limited exception (not applicable here), arbitration agreements covering employment-related claims fall within the FAA's provisions. *Id.* at 119 (holding that in the employment context "only contracts of employment of transportation workers" are exempted from the FAA's coverage).

It is against this backdrop of federal arbitration policy that we continue our analysis.

## V.

Under the FAA, federal arbitration policy must be implemented in lock-step with a determination of contract validity under state law. *First Options*, 514 U.S. at 944. We therefore turn to whether, under Pennsylvania contract law, the stricken portions of the arbitration agreement can be considered the essential part of the bargain. *Diebler*, 81 A.2d at 560-561. We have no difficulty in concluding that the primary purpose of the arbitration bargain entered into by Spinetti and SCI was not to regulate costs or attorney's fees. Instead, it was designed to provide a mechanism to resolve employment-related disputes:

> [W]e recognize that disputes may arise from time to time, which must be resolved in a fair and efficient manner. In order to ensure equitable, efficient and cost-effective resolution of these matters, employment-related disputes will be resolved by arbitration . . .

Form: P44, 1.

Having decided that the satellite issues of costs and attorney's fees may not be the tail wagging the dog, we must now ascertain the policy of Pennsylvania courts in granting partial enforcement of a contract. In the context of restrictive covenants, "[c]ase law empowers Pennsylvania courts to grant partial enforcement of an overbroad covenant either by excising offensive portions of the covenant or by adding language." *Bell Fuel Corp. v. Cattolico*, 544 A.2d 450, 457 (Pa. Super. Ct. 1988) (citing

*Sidco Paper Co. v. Aaron*, 351 A.2d 250, 254 (Pa. 1976)); *Barb-Lee Mobile Frame Co. v. Hoot*, 206 A.2d 59, 60 (Pa. 1975) ("The man who wildly claims that he owns all the cherry trees in the country cannot be denied protection of the orchard in his back yard.").

Section 603 of the RESTATEMENT (FIRST) OF CONTRACTS provides support for Pennsylvania law:

> A bargain that is illegal only because of a promise or a provision for a condition, disregard of which will not defeat the *primary purpose* of the bargain, can be enforced with the omission of the illegal portion by a party to the bargain who is not guilty of serious moral turpitude unless this result is prohibited by statute. Recovery is more readily allowed where there has been part performance of the legal portion of the bargain.

RESTATEMENT (FIRST) OF CONTRACTS § 603 (1932). (emphasis supplied).

Section 184 of the RESTATEMENT (SECOND) OF CONTRACTS contains the following similar language:

> (1) If less than all of an agreement is unenforceable under the rule stated in § 178, a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an *essential part* of the agreed exchange.

RESTATEMENT (SECOND) OF CONTRACTS § 184 (1981) (emphasis supplied).

In *Forbes v. Forbes*, 48 A.2d 153, 156 (Pa. Super. Ct. 1946), the court cited § 603 of the RESTATEMENT (FIRST) OF CONTRACTS in holding that an illegal provision collecting wages in a family settlement contract did not defeat the primary purpose of the agreement which was to provide for the support and maintenance of a spouse. Similarly, in *Huber v. Huber*, 470 A.2d 1385, 1389-1390 (Pa. Super. Ct. 1984), the court relied on § 184 of the RESTATEMENT (SECOND) OF CONTRACTS in ruling that an illegal attempt to condition enforcement of a post-nuptial agreement upon the award of an uncontested divorce to one of the parties did not defeat

the remaining provisions of a post-marital contract which contained the essential purpose of providing support for the couple's children.

Although bottomed on federal law and not state law, our teachings in *Watkins v. Hudson Coal Co.*, 151 F.2d 311 (3d Cir. 1945) are in total accord with Pennsylvania:

> The first point has to do with the question whether the formula and the waiver provisions which we have found to be insufficient under the [Fair Labor Standards] Act so completely vitiate the contract for illegality that no reference to arbitration can be made. We think this question must be answered in the negative. The sufficiency of the wage formula and the provision for waiver are entirely separable elements of the contract between the parties. We do not refer to arbitration the question of legality of the formula. That is a question of law which the Court must take responsibility in answering. All we are saying upon this point is that the arbitration provision is not rendered ineffective because the contract contains one clause, setting out the formula, and another clause setting forth a provision for waiver which we deem insufficient under the statute.

*Id.* at 320.

Pennsylvania law supports the actions of the district court in referring Spinetti's employment discrimination dispute to arbitration and striking the agreement's illegal provisions. Under Pennsylvania law, "a court of equity may not only remove an offensive term, but may supply a new, limiting term and enforce the covenant so modified. This unique power to modify the parties' contract . . . arises from the general equity powers of the court." *Bell Fuel Corp.*, 544 A.2d at 457. *See also Barb-Lee Mobile Frame*, 206 A.2d at 60 ("The unique virtue of equity is that it sometimes straightens out morally damaged frames as well as rehabilitates legally wrecked principles.").

## VI.

Not all federal courts have been as hostile to arbitration agreements containing unenforceable clauses as Appellant

would have us believe. In *Cole*, the court denied enforcement to only a *portion* of a similar arbitration agreement that required the employee to pay all or part of the arbitrator's fees. The court concluded that such an individual provision would not be enforceable because it:

> would undermine Congress's intent [in enacting anti-discrimination laws by preventing] employees who are seeking to vindicate statutory rights from gaining access to a judicial forum and then requir[ing] them to pay for the services of an arbitrator when they would never be required to pay for a judge in court.

*Cole*, 105 F.3d at 1484. The court chose to construe the ambiguous clause concerning arbitrator fees in a fashion that imposed the duty on the employer to pay, and thus avoided conflict with established rights of employees.

Other courts adopted an even more proactive approach toward agreement preservation. In *Gannon*, the court held that the FAA's policy favoring the enforcement of arbitration agreements supported its conclusion that the district court should have *severed* an unenforceable provision from an otherwise enforceable arbitration agreement. It explained that it would be contrary to federal policy to undermine an entire arbitration agreement based upon a single potentially unenforceable term:

> The boundaries of private arbitration agreements in the employment context are currently being set, with the Supreme Court only recently affirming that the FAA extends to arbitration agreements covering employment disputes. In an evolving climate such as this, if we were to hold entire arbitration agreements unenforceable every time a particular term is held invalid, it would discourage parties from forming contracts under the FAA and severely chill parties from structuring their contracts in the most efficient manner for fear that minor terms eventually could be used to undermine the validity of the entire contract. Such an outcome would represent the antithesis of the liberal federal policy favoring arbitration agreements.

*Gannon*, 262 F.3d at 682 (citation and quotation omitted). *See also Giordano*, 2001 WL 484360 at *6 (granting a

motion to compel arbitration under provisions of an arbitration agreement exclusive of an invalid sentence stating, "[t]he Company and I shall equally share the cost of the Arbitrator's fee, in the amount and manner determined by the Arbitrator"); and *Zumpano v. Omnipoint Communications*, 2001 WL 43781, at \*12 (E.D. Pa. Jan. 18, 2001) (stating, in *dicta*, that the court would nullify any offensive portion of the arbitration agreement and compel arbitration).

Appellant attempts to override this progressive federal policy favoring enforcement of arbitration agreements and the potential severance of offensive provisions by offering two separate arguments: (1) the teaching gleaned from the three opinions in *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677 (7th Cir. 2002), examining the very same Agreement, provides persuasive authority that severance and subsequent enforcement of the Agreement is improper; and (2) all previous citations to circumstances in which a court severed offending arbitration provisions and enforced the remainder of the agreement occurred in situations where the arbitration agreement itself contained a severance clause.

**A.**

We quickly dispose of the attempt to enliven *McCaskill* as an analog. There, Judge Rovner adopted the reasoning stated in the panel's previous opinion in *McCaskill v. SCI Mgmt. Corp.*, 285 F.3d 623 (7th Cir. 2002), *reh. granted and op. vacated by McCaskill*, 298 F.3d 677, that the Agreement was unenforceable on the ground that it precluded attorney's fees under Title VII. However, in analyzing the holding of *Graham Oil v. Arco Products Co.*, 43 F.3d 1244 (9th Cir. 1994), Judge Rovner cautioned that severance was not even considered as a potential remedy: "the attorney's fees clause, as well as two other contravening clauses, were not severable from the arbitration agreement as a whole — a claim not even raised in this case and therefore not before us here." *McCaskill*, 298 F.3d at 685.[3]

---

3. Moreover, it is difficult to attribute much potency to a case in which there were three separate opinions, and we decline to conclude that there is any persuasive value to it because a claim of "severab[ility] . . . [was] not even raised." *McCaskill*, 298 F.3d at 685. Unlike *McCaskill*, severability is the main issue before us.

**B.**

Appellant next contends that those courts that have severed objectionable provisions generally relied upon a specific clause in the arbitration agreement allowing for severability. *See, e.g., Gannon*, 262 F.3d at 683 n.8 (noting that the agreement contained an explicit clause providing for severability); *Giordano*, 2001 WL 484360, at *6 (same). On this issue we turn to Pennsylvania law. None of the cases relied on by the Appellant specifically holds that there cannot be severance in the absence of a clause in the contract explicitly providing for it. *See, e.g., Gannon*, 262 F.3d at 683 (stating, without mentioning the import of a severability clause, that "[s]evering the . . . clause is consistent with the terms of the contract, the intent of the parties, [state] contract law, and the FAA's policy favoring the enforcement of arbitration agreements"); *Giordano*, 2001 WL 484360, at *6 (noting that the severability clause is not decisive on its own, but merely leaves "little doubt" as to the enforceability following a severance). Indeed, such a crabbed interpretation would do violence to Pennsylvania contract law, as evidenced by *Forbes* and *Huber*, endorsing provisions of the RESTATEMENT OF CONTRACTS heretofore set forth in Section V.

**VII.**

Both parties and the Amicus have unloaded upon us a veritable barrage of cases from jurisdictions other than Pennsylvania and this Court. In citing these cases, they have not furnished much assistance in several respects. They have (1) not explained what was the primary object of the arbitration, (2) set forth the determinative state law governing the severance of portions of a contract, and (3) discussed the various provisions of the RESTATEMENT OF CONTRACTS. What the parties actually did reminds us of the admonition of Judge Cardozo:

> [T]he work of deciding cases in accordance with precedents . . . is a process of search, comparison, and little more. Some judges seldom get beyond that process in any case. Their notion of their duty is to match the colors of the case at hand against the colors

of many sample cases spread out upon their desk. The sample nearest in shade supplies the applicable rule. But, of course, no system of living law can be evolved by such a process, and no judge of a high court, worthy of his office, views the function of his place so narrowly. If that were all there was to our calling, there would be little of intellectual interest about it.[4]

An examination of the cases relied upon by the Appellant and Amicus indicates that they emphasized only the *results* of the cases. For the most part, these cases either demonstrated that the illegal provisions constituted the essential or primary purposes of arbitration (a situation not before us) or failed to adhere to, or even to discuss, the ineluctable approach to the severability of contract provisions — a consideration of relevant state law regarding severability of parts of a contract. Instead, the sample nearest to the result they desired — denying arbitrability — was offered as "the applicable rule" without discussing the fact-driven, relevant controlling legal precepts.

For example, the following cases involved circumstances where the illegal provisions constituted the primary or essential purpose of the arbitration: *Graham Oil*, 43 F.3d at 1248-1249 (holding that multiple illegal provisions tainted the entire purpose of the arbitration agreement); *Paladino v. Avnet Computer Technologies, Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998) (holding that where the challenged provisions defeat basic remedial purposes of Title VII, the arbitration agreement cannot be enforced); *Murray v. United Food and Commercial Workers Int'l Union, Local 400*, 289 F.3d 297, 303 (4th Cir. 2002) (holding that an arbitration agreement was unenforceable because the agreement drafted by the employer "placed control over the selection of the single arbitrator for employment disputes in the hands of [the] employer"). Still other cases failed to identify or emphasize state law or the RESTATEMENT OF CONTRACTS. *See, e.g., Shankle v. B-G Maint. Mgmt. of Colo., Inc.*, 1997 WL 416405 (D. Colo. Mar. 24, 1997) (failing to make any reference to state severance law and, while citing *Cole* as authority, neglecting to follow its holding).

4. BENJAMIN N. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 20-21 (1921).

## VIII.

Moving beyond specific case law, we turn to the argument of the Amicus, the Equal Employment Opportunity Commission ("EEOC"), that the employer should not have the benefit of a sanitized arbitration procedure stripped of the improper attorney's fees and arbitration costs clauses.

The EEOC primarily argues that the presence of agreements, like that of SCI, would operate as a disincentive to vindicate employee rights under the relatively inexpensive arbitration procedure. The specters of advancing four-figure arbitration costs and the payment of one half of attorney's fees, like those present here, it argues, would have a daunting, discouraging and intimidating effect on an employee standing on the lower rungs of the economic ladder, and, therefore, the entire arbitration agreement should be voided.

There is some surface appeal to this contention, but it does not survive thoughtful analysis. To accept the EEOC's position is to throw the baby out with the bath water. It would compel the impecunious employee to resort to the courts — the only alternative to arbitration in dispute adjudication. To go to court would then require the employee to hire a lawyer, to endure the costs and delays of discovery and to incur all the expenses of litigation. To accept the EEOC's submission would be to deny the employee the real benefits of arbitration — "benefit[s] that may be of particular importance in employment litigation, which often involves smaller sums of money than disputes concerning commercial contracts." *Adams*, 532 U.S. at 123.

Second, the relief urged by the EEOC and the Appellant would fly in the face of the federal pro-arbitration policy, as heretofore set forth in detail.

Third, although we laud the Amicus' desire to dissuade, disincline and deter employers from inserting these illegal provisions in their employment contracts that place financially impaired employees at a great disadvantage, the increasing awareness by claimants' counsel of their severability will at least ensure that employees who inquire about remedies will be given appropriate advice by counsel.

Moreover, in a situation where an employer had deliberately misled an employee about the unavailability to the employee of federally provided remedies, sanctions such as punitive damages might be available.

\* \* \* \*

We have considered all contentions raised by the parties, but in light of the view we take in this case, no further discussion is necessary.

The judgment of the district court as interpreted by us will be affirmed.

A True Copy:
    Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*