**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4010
_____

SOUTH JERSEY SANITATION COMPANY, INC.

v.

APPLIED UNDERWRITERS CAPTIVE RISK
ASSURANCE COMPANY, INC.,
                                        Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW JERSEY
(D.C. No. 1-13-cv-06717)
District Judge:  Joseph E. Irenas
_____

Argued January 20, 2016
_____

Before: JORDAN, HARDIMAN, and GREENAWAY,
JR., *Circuit Judges*.

(Opinion Filed: October 25, 2016)

1

Susan Karlovich, Esq.
Thomas F. Quinn, Esq. [**ARGUED**]
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
200 Campus Drive
Florham Park, NJ 07932
    *Counsel for Appellant*


Louis M. Barbone, Esq. [**ARGUED**]
Jacobs & Barbone, P.A.
1125 Pacific Avenue
Atlantic City, NJ 08401
    *Counsel for Appellee*

_____

OPINION
_____

GREENAWAY, JR., *Circuit Judge*.

## I. INTRODUCTION

Applied Underwriters Captive Risk Assurance Company, Inc. ("Applied Underwriters"), a Berkshire Hathaway Company, appeals from the District Court's denial of its motion to compel arbitration in its contract-based dispute with Appellee South Jersey Sanitation Company, Inc. ("South Jersey"). Because we find that South Jersey's purported challenges to the arbitration agreement apply to the parties' contract as a whole, rather than to the arbitration agreement alone, the parties' dispute is arbitrable and we will reverse.

## II. FACTUAL AND PROCEDURAL BACKGROUND

South Jersey is a trash-removal business with over eighty employees. On September 3, 2008, as its workers' compensation insurance policy neared expiration, South Jersey, through its insurance agent, entered into a Reinsurance Participation Agreement ("RPA") with Applied Underwriters. The stated purpose of the RPA is to establish South Jersey's participation "in [Applied Underwriters's] segregated protected cell reinsurance program."[1] (App. 96.)

The RPA, which has a three-year term, contains a one-and-one-half-page arbitration provision, according to which "any disputes arising under [the RPA]" would be arbitrated either in Tortola or in a location on which the parties agreed. (App. 98–100.) It also contains a choice-of-law provision, which indicates that the RPA "shall be exclusively governed by" Nebraska law. (App. 100.) The RPA and its attached tables of "Loss Development Factors," "Exposure Group Adjustment Factors," and "Loss Pick Containment Rates and Estimated Annual Amounts," total ten pages.

In its complaint, South Jersey alleges that it entered into the RPA when its workers' compensation insurance was about to expire in the belief that the RPA was a replacement workers' compensation insurance policy. South Jersey argues that Applied Underwriters fraudulently presented the RPA as such an insurance policy. South Jersey contends that, in reality, the RPA is a retrospective rating or "retro" insurance policy pursuant to which South Jersey's premiums for each payment policy period would be based on claims paid during

---

[1] As noted throughout this opinion, the precise nature and effect(s) of the RPA are both actively disputed by the parties and unclear from the face of the document itself.

the previous period. South Jersey alleges that it was promised that it could "realize 'huge rebates' at the end of the policy term in the event that premiums far outweighed the payouts required for worker's compensation benefits." (App. 2.)

South Jersey also notes in its complaint that Applied Underwriters is "not an insurer defined under New Jersey statutes" and therefore cannot issue workers' compensation insurance policies in New Jersey. (App. 6.) Nevertheless, in its appellate brief, South Jersey posits that "the plain language of the RPA clearly relates to, concerns[,] and actually issues a workers' compensation policy to [South Jersey]."[2] (Appellee Br. 7.)

Before the District Court, Applied Underwriters represented that South Jersey purchased a primary workers' compensation insurance policy from Continental Indemnity Company ("Continental"). Like Applied Underwriters, Continental is a Berkshire Hathaway Company. Continental then entered into a pooling agreement with California Insurance Company ("California"), another Berskshire Hathaway Company. (App. 142–43.) This pooling agreement was a reinsurance treaty.[3] Applied Underwriters,

_____

[2] South Jersey bases this assertion on the following language from the RPA: "During the Active Term of this Agreement, Workers' Compensation Insurance coverage will be provided to Participant by one or more of the Issuing Insurers." (Appellee Br. 7 (quoting App. 97).)

[3] Reinsurance can be viewed as "'insurance for insurance companies,' . . . whereby a reinsured . . . cedes

4

in turn, provided reinsurance to California and, derivatively, to Continental.

According to Applied Underwriters, the RPA was not a workers' compensation insurance policy, but rather an investment instrument. Applied Underwriters argues that the RPA "is simply not an 'insurance policy,' but rather a contract 'relating [to] or concerning' a reinsurance policy." (Appellant Br. 30.) Applied Underwriters further contends that, under the RPA, if South Jersey "had low cost [workers' compensation] claims, it would receive a profit[-]sharing distribution under the RPA from its segregated protected cell. If its losses were high, it enjoyed the cap protection of the maximum threshold in the RPA." (*Id.* at 6.) Essentially, the RPA would allow South Jersey to speculate as to its future performance under its actual workers' compensation policy with Continental by "financially shar[ing] in the underwriting results based on actual losses incurred and the size of its payroll." (Appellee Br. 6.) Indeed, Paragraph Three of the

---

some of its risk to a reinsurer . . . and shares its premium with the reinsurer." *Certain Underwriters at Lloyd's London v. Westchester Fire Ins. Co.*, 489 F.3d 580, 582 n.1 (3d Cir. 2007) (quoting *Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 729 n.1 (7th Cir. 2005)).

"[A] reinsurance treaty involves an agreement by a reinsurer 'to accept an entire block of business from the reinsured . . . . Because a treaty reinsurer accepts an entire block of business, it does not assess the individual risks being reinsured; rather, it evaluates the overall risk pool.'" *Id.* at 582 (omission in original) (quoting *N. River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1199 (3d Cir. 1995)).

5

RPA indicates that "Participant is participating in this Agreement for purposes of investment only." (App. 96.)

For two years and ten months of the RPA's three-year period, South Jersey received and paid monthly invoices for premiums ranging from $40,000 to $50,000, with the expectation of receiving a rebate at the end of the policy period. South Jersey based its expected refund on the fact that it had "paid in excess of $1,200,000 in premiums" over the term of the RPA and that the workers' compensation claims paid on its behalf "totaled the approximate amount of $355,000 over three years."[4] (App. 3.) "In July of 2011[,] however, approximately two months before the calculation of [South Jersey's] rebate, [Applied Underwriters] sent a premium invoice in the amount of $218,887.04." (Suppl. App. 23.) South Jersey alleges that, when it contacted Applied Underwriters about this amount, it was told that the premium was driven by loss history.

South Jersey asserts that it paid $60,000 to avoid cancellation of the RPA, but that Applied Underwriters nevertheless issued a "Notice of Cancellation effective August 1, 2011." (App. 4.) South Jersey then secured a workers' compensation insurance policy with a different carrier, and Applied Underwriters continued to send South Jersey invoices for fluctuating amounts. Ultimately, Applied

---

[4] As the District Court noted, the calculus is, of course, more complicated than premiums minus claims paid, because the policy tail would permit claims to continue well beyond the policy term.

6

Underwriters declared that South Jersey owed $300,632.94 in an invoice dated September 26, 2012.[5] South Jersey did not pay, and Applied Underwriters filed a demand for arbitration with the American Arbitration Association seeking this amount on September 26, 2013.

On October 31, 2013, South Jersey filed a complaint in the New Jersey Superior Court, Chancery Division, seeking declaratory relief as to the arbitration provision and rescission of the RPA (Counts One and Two), as well as damages for breach of contract (Count 3); fraud, intentional misrepresentation, and illegality (Count 4); and negligent misrepresentation (Count 5).

On November 4, 2013, Applied Underwriters removed the case to federal court on the basis of diversity jurisdiction. South Jersey moved to remand the case to state court one month later. Applied Underwriters responded by filing a motion to dismiss and to compel arbitration in lieu of an answer.

The District Court heard arguments on these motions on May 5, 2014, and denied South Jersey's motion to remand that day. On August 25, 2014, the Court denied the motion to compel arbitration and ordered Applied Underwriters to file an Answer. The District Court based its denial on the following findings: (1) Nebraska law governs the dispute pursuant to the RPA's choice-of-law clause; (2) Section 25-2602.01 of the Nebraska Revised Statutes ("the Nebraska

---

[5] The District Court asked counsel how that amount was calculated but never received an explanation, and the record remains obscure on this point.

Statute") "sets forth that all arbitration provisions 'concerning or relating to an insurance policy,' except those 'between insurance companies,' are unenforceable" (App. 33); (3) "the RPA is not a contract between insurance companies" (App. 34); (4) the Nebraska Statute preempts the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16,[6] through the McCarran-Ferguson Act ("M-FA"), 15 U.S.C. §§ 1011–1015;[7] and (5) the arbitration provision is therefore unenforceable.

---

[6] Section 2 of the FAA provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

[7] The M-FA provides in relevant part that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance[.]" 15 U.S.C. § 1012. Thus, "[u]nder [the M-FA], state laws reverse[-]preempt federal

Applied Underwriters filed a notice of appeal on September 19, 2014. It argues that the District Court erred in reaching the issue of reverse-preemption without first considering whether arbitrability is a question for the courts or the arbitrator; that arbitrability is, in fact, a question for the arbitrator under the terms of the RPA; that the Nebraska statute does not reverse-preempt the FAA; and that, even if it did, the Nebraska Statute is inapposite, inasmuch as the RPA does not fall within its purview.

South Jersey counters that the District Court properly determined that the RPA falls within the scope of the Nebraska Statute, that the Nebraska Statute reverse-preempts the FAA, and that the RPA's arbitration provision is therefore unenforceable. South Jersey adds that Count Four of its Complaint, entitled "Fraud, Intentional Misrepresentation and Illegality" (App. 12.), "serves as an additional basis to invalidate the arbitration agreement, or the contract as a whole, without contravening the FAA" (Appellee Br. 5).

---

laws if (1) the state statute was enacted 'for the purpose of regulating the business of insurance,' (2) the federal statute does not 'specifically relate to the business of insurance,' and (3) the federal statute would 'invalidate, impair, or supersede' the state statute." *Suter v. Munich Reins. Co.*, 223 F.3d 150, 160 (3d Cir. 2000).

## III. JURISDICTION & STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332(a); this Court has jurisdiction pursuant to 9 U.S.C. § 16(a)(1)(C) and 28 U.S.C. § 1292(a)(1).

Our review of all facets of this appeal is plenary. First, "[w]e exercise plenary review over questions regarding the validity and enforceability of an agreement to arbitrate." *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 177 (3d Cir. 2010) (en banc). Second, because preemption determinations are questions of law, we review such determinations de novo. *Horn v. Thoratec Corp.*, 376 F.3d 163, 166 (3d Cir. 2004) (citations omitted). Finally, to the extent that this appeal requires construction of statutory or contractual provisions, our review is also plenary. *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (contracts); *Seamans v. Temple Univ.*, 744 F.3d 853, 859 (3d Cir. 2014) (statutes).

## IV. ANALYSIS

"Congress enacted the [FAA] 'to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts.'" *Puleo*, 605 F.3d at 177–78 (second alteration in original) (quoting *Spinetti v. Serv. Corp. Int'l*, 324 F.3d 212, 218 (3d Cir. 2003)). Although the FAA favors arbitration and limits the involvement of the court system in contracts that provide for arbitration, "[l]ike other contracts, [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). Accordingly, where a

party challenges the validity of an otherwise controlling arbitration clause, courts hear that challenge. *See id.* at 71 ("If a party challenges the validity under [FAA] § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under [FAA] § 4.").

The challenge, however, must focus exclusively on the arbitration provision, rather on than the contract as a whole. As the Supreme Court stressed in *Rent-A-Center*, "only [an arbitration provision-specific] challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable." *Id.* at 70. If the challenge encompasses the contract as a whole, the validity of that contract, like all other disputes arising under the contract, is a matter for the arbitrator to decide. *See id.*

The RPA's arbitration provision, like the comprehensive arbitration agreement at issue in *Rent-A-Center*, applies to "[a]ll disputes arising with respect to any provision of" the RPA and confers "binding and conclusive" authority on the arbitrator. (App. 99.) Thus, unless South Jersey specifically challenges the legal validity of the RPA's arbitration provision, the parties' present dispute, which arises out of the RPA, is subject to arbitration.

We find that neither of South Jersey's challenges focus on the arbitration provision alone, and we therefore reverse the District Court's denial of Applied Underwriters's motion to compel arbitration.

11

## A. Fraud, Intentional Misrepresentation, and Illegality

In its complaint, South Jersey sets forth its fraud-based challenge in the following terms:

> 35. Defendant Applied Underwriters did at all times relevant hereto factually misrepresent the terms and conditions of its contract, so as to induce plaintiff to pay premiums totaling in excess of $1,200,000 while at the same time contracting with an insurer to pay worker's compensation losses of approximately one-third of those premiums. Defendant did by its false factual representations induce plaintiff's reasonable expectation and reliance upon a term-end rebate given its employment and loss history in worker's compensation. Defendant's factual representations were false, as demonstrated by the defendant's admission that its premiums were "inflated[."] Defendant knew that it had represented and induced plaintiff's participation in its contract of reinsurance by representing plaintiff's entitlement to a rebate, and by further, over a period of thirty-four months[,] consistently billing the plaintiff for policy premiums of between $40,000 and $50,000. Ultimately, when plaintiff was to realize its substantial rebate given premiums paid in comparison to its loss history, defendant manipulated its "estimates" and fictitious formulas to avoid payment of that rebate and to instead threaten plaintiff with cancellation if the inflated and fictitious premiums were not paid.

36. Defendant has[,] by virtue of the aforenoted conduct, committed fraud upon the plaintiff pursuant to unconscionable contractual terms and conditions in violation of New Jersey law and public policy.

(App. 12–13.)

It is plain from these paragraphs that South Jersey alleges no arbitration provision-specific fraud, but rather challenges the arbitration provision only as part of its general challenge of the contract. Indeed, South Jersey states in its brief that "[f]raud is a defense that is generally applicable to all contracts and can invalidate a whole contract or certain portions thereof, including arbitrations [sic] agreements." (Appellee Br. 4 (citation omitted).)

Even before *Rent-A-Center*, however, it was plain that a wholesale fraud defense could not defeat a clear arbitration provision. Almost fifty years ago, the Supreme Court confronted "the question whether the federal court or an arbitrator is to resolve a claim of 'fraud in the inducement,' under a contract governed by the [FAA], where there is no evidence that the contracting parties intended to withhold that issue from arbitration." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 396–97 (1967). The Court held that, "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it." *Id.* at 403–04. "But," the Court added, "the [FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Id.* at 404; *accord Rent-A-Ctr.*, 561 U.S. at 70–72 (noting that challenges to a contract as a whole are not relevant to a court's

13

determination of the enforceability of the arbitration clause, which is treated as severable).

In light of this clear and longstanding precedent, we conclude that South Jersey's claim of fraud should be left for the arbitrator's consideration. We accordingly turn to South Jersey's second argument in favor of invalidating the arbitration provision—that the provision is unenforceable under Nebraska law.

## B. The Effect of the Nebraska Statute

On its face, South Jersey's contention that the RPA's arbitration provision is rendered unenforceable by the Nebraska Statute appears to target the arbitration provision alone, rather than the contract as a whole. This argument, however, suffers from the same defect as South Jersey's fraud argument because—regardless of whether the Nebraska Statute reverse-preempts the FAA[8]—that statute must first be shown to apply to the arbitration provision at issue. We determine that it is not clear that the short but obscure RPA falls within the ambit of the Nebraska Statute.

South Jersey, as the party seeking to avoid the arbitration provision, bears the burden of showing that it falls

---

[8] We do not decide here whether the Nebraska Statute reverse-preempts the FAA because South Jersey has not persuaded us that the Nebraska Statute is applicable to the contract at issue. To determine its applicability, the precise function and contours of the RPA must be elucidated, and that is a matter for the arbitrator under the parties' clear and expansive arbitration agreement.

within Subsection (f)(4) of the Nebraska Statute. *See, e.g.*, *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000) ("[T]he party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue." (citation omitted)).

The Nebraska Statute provides in relevant part:

(b) A provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable, and irrevocable, except upon such grounds as exist at law or in equity for the revocation of any contract, if the provision is entered into voluntarily and willingly.

. . . .

(f) Subsection (b) *of this section does not apply to:*

. . . .

(4) Except as provided in section 44-811, *any agreement concerning or relating to an insurance policy other than a contract between insurance companies including a reinsurance contract.*

Neb. Rev. Stat. § 25-2602.01 (emphases added).

In *Kremer v. Rural Community Insurance Co.*, 788 N.W.2d 538, 550 (Neb. 2010), the Nebraska Supreme Court stated that, "under § 25–2602.01(f)(4), agreements to arbitrate

15

future controversies concerning an insurance policy are invalid." Noting that "[e]very federal appellate court to address this issue has held that state laws restricting arbitration provisions in insurance contracts regulate the business of insurance and are not preempted by the FAA," *id.* at 552 (citations omitted), the Nebraska Supreme Court "conclude[d] that a statute precluding the parties to an insurance contract from including an arbitration agreement for future controversies regulates the insurer-insured contractual relationship," *id.* at 553. In reaching this conclusion, the court noted that it did not consider dispositive "whether statutes restricting arbitration agreements in insurance policies affect the transfer of risk." *Id.* at 552. This language, while *dicta*, strongly suggests that Subsection (f)(4) of the Nebraska Statute applies only to insurance policies themselves, and that "any agreement" must be read as an arbitration agreement or provision within such a policy, rather than a derivative investment contract.[9]

South Jersey's assertion that "the RPA clearly relates to, concerns and actually issues a workers' compensation policy to [South Jersey]" (Appellant Br. 7) is not sufficient to carry South Jersey's burden of demonstrating that the RPA is an "agreement concerning or relating to an insurance policy"

---

[9] We note that this construction of the Nebraska Statute, which reads the phrase "any agreement concerning or relating to an insurance policy" narrowly, comports with the M-FA, which permits reverse-preemption only by those state statutes "regulating the business of insurance." 15 U.S.C. § 1012.

within the meaning of the Nebraska Statute. First, the argument fails to address what degree of "concern" or "relation" to an insurance contract is necessary to bring an agreement under Subsection (f)(4). Second, that assertion is at odds with South Jersey's own argument that Applied Underwriters is not an insurer, as well as with Applied Underwriters's contention that the RPA is an investment instrument. Finally, the District Court never found that the RPA falls within the ambit of the Nebraska Statute, despite repeatedly expressing concern as to the indecipherability of the RPA. (*See* App. 139, 141, 148, 151, 167, 176.)

Faced with a disputed agreement whose fundamental nature remains obscure, we conclude that, by the clear and comprehensive arbitration provision in the RPA, it is for the arbitrator to determine what the precise nature of the RPA is and whether the RPA falls within Subsection (f)(4). This challenge, like the fraud challenge, implicates the RPA as a whole; like the fraud challenge, therefore, the question of whether the RPA's arbitration provision is enforceable under Nebraska law is a question for the arbitrator.

## IV. CONCLUSION

For the foregoing reasons we will vacate the judgment of the District Court and remand the matter. If the District Court determines that the parties agree to arbitrate this dispute in New Jersey,[10] we direct that the District Court refer the

---

[10] Paragraph 13(I) of the agreement provides: "All arbitration proceedings shall be conducted in the English language in accordance with the rules of the American Arbitration Association and shall take place in Tortola,

17

matter to arbitration. On the other hand, if the District Court determines that there is no such agreement, then the District Court shall decide, in the first instance, how to proceed in light of its inability to compel arbitration in the default location provided for in the contract. *See Econo-Car Int'l, Inc. v. Antilles Car Rentals, Inc.*, 499 F.2d 1391, 1394 (3d Cir. 1974) (noting the requirement that "arbitration 'shall be within the district in which the petition for an order directing such arbitration is filed'" (quoting 9 U.S.C. § 4)).

---

British Virgin Islands *or at some other location agreed to by the parties*." (App. 99.)