[878 NYS2d 693]

LORRAINE C. BRADY, Appellant, v THE WILLIAMS CAPITAL GROUP, L.P., Respondent, et al., Respondent.

First Department, April 30, 2009

### APPEARANCES OF COUNSEL

*Wechsler & Cohen, LLP*, New York City (*David B. Wechsler* of counsel), for appellant.

*Schiff & Hardin LLP*, New York City (*Marc L. Silverman* of counsel), for The Williams Capital Group, L.P., respondent.

### OPINION OF THE COURT

RENWICK, J.

This dispute arises from an employment discrimination arbitration commenced by Lorraine C. Brady (Brady) against her former employer, The Williams Capital Group, L.P. (Williams) before the American Association Arbitration (AAA). The AAA cancelled the proceedings when Williams refused to pay the cost of arbitration pursuant to AAA rules. Such refusal was based on Williams's employee manual, which required the parties to equally share the arbitrator's compensation. As a result,

Brady sought a court order compelling Williams to arbitrate in compliance with the AAA rules. Supreme Court denied the petition and this appeal ensued. The appeal raises two questions: first, whether the AAA's "employer pays" rule should supersede the "fee-splitting" provision of the parties' arbitration agreement with regard to the arbitrator's compensation; second, whether the fee-splitting arbitration provision should be invalidated as violative of public policy in this instance. We answer the first question in the negative and the second question in the affirmative.

## Facts and Procedural Background

The material facts are not in dispute. Williams, an investment banking firm, hired Brady in January 1999 to work as a salesperson of fixed income securities. In or about January 2000, Williams adopted an employee manual signed by all employees as a condition of continued employment. The employee manual, requiring the arbitration of all disputes, contains a clause in which the employee and employer agree to equally share the fees and costs of the arbitrator. In addition, the arbitration agreement contains a provision that provides:

> "The Company and I agree that, except as provided in this Agreement, any arbitrations shall be in accordance with the then-current Model employment Arbitration Procedures of the American Arbitration Association ('AAA') before an arbitrator who is licensed to practice law in the state in which the arbitration is convened ('the Arbitrator'). The arbitration shall take place in or near the city in which I am or was last employed by the Company."

Williams terminated Brady's employment on February 28, 2005. On December 22, 2005, Brady commenced an arbitration with the AAA against Williams claiming discriminatory termination in violation of state and federal law.[1] On January 3, 2006, the AAA notified the parties that it had determined that the arbitration would be conducted consistent with an employer-sponsored plan.[2] The applicable AAA rule provides:

> "The parties shall be deemed to have made these

---

**1.** Initially, Brady filed a complaint with the New York State Division of Human Rights. After approximately eight months, she withdrew her complaint and commenced the arbitration proceeding before the AAA.

**2.** The AAA rules make a distinction between "Employer-Promulgated Plans" and "Individually-Negotiated Employment Agreements and

*(n. cont'd)*

rules a part of their arbitration agreement whenever they have provided for arbitration by [AAA] or under its National Rules for the Resolution of Employment Disputes. If a party establishes that an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules" (AAA National Rules for the Resolution of Employment Disputes rule 1).

By March 30, 2006, the parties had engaged in significant prehearing discovery. In accordance with its own "employer pays" rule, which requires the employer to pay the arbitrator's compensation, the AAA sent Williams a bill for $42,300, which represented the entire advance payment for the arbitrator's compensation. Williams refused to pay the entire advance payment of the arbitrator's compensation, and demanded that Brady pay half in accordance with the parties' arbitration agreement in the employee manual. Brady refused to make any payment.

In response to the dispute, the AAA advised the parties that Brady's position was accurate since its own rules regarding arbitration compensation superseded any agreement to the contrary. Specifically, the AAA explained:

> "The Association has determined that this matter arises from an employer-promulgated plan. The parties' attention is drawn to Rule 1 . . . which provides that . . . 'if a party establishes that an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules.' "

After waiting for about five months for payment of the arbitrator's fee, the AAA cancelled the arbitration. Brady sought to revive the arbitration by commencing this CPLR article 78 proceeding seeking to compel Williams to pay the arbitrator's fee or to compel the AAA to enter a default judgment against Williams for failing to do so. Supreme Court, however, dismissed the article 78 petition in its entirety. First, the court reasoned that the parties' agreement, rather than the AAA rules, governed. Second, the court summarily rejected Brady's claim that her half share of arbitrator's compensation ($21,150) was prohibitively expensive due to the fact that she had been

---

Contracts." In the former, the employer bears the cost of the arbitrator's compensation unless the employee elects, postdispute, to pay a portion.

unemployed for 18 months since her termination. (For the year prior to her termination, 2004, Brady reportedly earned $204,691 in salary based on commissions.)[3] Instead, the court found that Brady's rights under the antidiscrimination statutes were not substantially impaired by the requirement that she pay half of the arbitrator's compensation.

## Discussion

This case involves a former employee seeking to compel a former employer to arbitrate.[4] It is well settled that a court will not order a party to submit to arbitration absent evidence of "that party's unequivocal intent to arbitrate the relevant dispute" (*Matter of Helmsley [Wien]*, 173 AD2d 280, 281 [1991]), and unless the dispute is clearly the type of claim that the parties agreed to refer to arbitration (*Matter of Bunzl [Battanta]*, 224 AD2d 245, 246 [1996]). The threshold determination of "whether there is a clear, unequivocal and extant agreement to arbitrate" the disputed claims is to be made by the court and not the arbitrator (*Matter of Primex Intl. Corp. v Wal-Mart Stores*, 89 NY2d 594, 598 [1997]).

### A.

Williams does not dispute that a valid agreement to arbitrate exists between the parties. Nor does Williams deny that the dispute Brady seeks to arbitrate—whether her termination was discriminatory—falls within the scope of the arbitration agreement. Instead, Williams argues that it can only be compelled to arbitrate in accordance with the terms of the employment agreement, which requires the parties to equally share the cost of the arbitrator regardless of what the AAA rules say.

■ We resolve this conflict between the arbitration agreement and the AAA rules in favor of the arbitration agreement.

---

3. Plaintiff's reported salaries for 1999 to 2003 were respectively $100,000, $137,500, $324,000, $356,000 and $405,000.

4. The case is unusual in that the former employee here seeks to compel her former employer to arbitrate an alleged discriminatory employment termination. Usually, the party who seeks to compel arbitration of such an employment dispute is the former employer, when it also seeks to stay a judicial proceeding commenced by the former employee aggrieved by the termination (*see e.g. Primerica Life Ins. Co. v Brown*, 304 F3d 469 [5th Cir 2002]; *Thompson v Irwin Home Equity Corp.*, 300 F3d 88 [1st Cir 2002]; *Mildworm v Ashcroft*, 200 F Supp 2d 171, 179 [ED NY 2002]). However, the context of the application to compel arbitration is not significant since any "party aggrieved by the failure of another to arbitrate may apply for an order compelling arbitration" (CPLR 7503 [a]).

Whether a fee-splitting clause in an arbitration agreement supersedes a contrary AAA rule presents a general issue of contract interpretation governed by New York law (*see Credit Suisse First Boston Corp. v Pitofsky*, 4 NY3d 149, 154 [2005]). "[A]rbitration is a creature of contract, and it has long been the policy of the State to 'interfere as little as possible with the freedom of consenting parties' in structuring their arbitration relationship" (*id.* at 155, quoting *Matter of Siegel [Lewis]*, 40 NY2d 687, 689 [1976]). As such, the parties control the scope of arbitration, the authority and selection of arbitrators, the choice of law, every aspect of the arbitration (*see Matter of Salvano v Merrill Lynch, Pierce, Fenner & Smith*, 85 NY2d 173, 182-183 [1995]). "The court's role is limited to interpretation and enforcement of the terms agreed to by the parties; it does not include the rewriting of their contract and the imposition of additional terms" (*id.* at 182).

To read into the arbitration agreement the AAA rule that the "employer pays" the arbitrator's compensation would be to fundamentally modify the terms of the agreement and to force Williams to arbitrate in a manner contrary to the agreement to which it had assented. In the relevant portion of the arbitration agreement, the parties agreed to equally share the arbitrator's compensation. In another relevant portion, the parties agreed that any arbitration would be in accord with AAA rules, except as otherwise provided in the agreement. The provisions, read together, are clear and unambiguous as to the parties' intent to share the cost of the arbitrator's compensation.

We reject petitioner's argument that, regardless of the clear language of the agreement, the AAA compensation provision that the "employer pays" must prevail because the AAA rule in effect at the time of the arbitration provided that if "an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules." The arbitration agreement must take precedence over the AAA rules since the parties explicitly agreed to be bound by the provisions of the arbitration agreement where there was a conflict between the agreement and the AAA rules, including the arbitrator's compensation. The parties were free to have the AAA rules supersede the arbitration agreement where there was a conflict between them, but decided to do otherwise.

### B.

 Although we find that the disputed fee-splitting provision of the employment arbitration agreement was not superseded

by the conflicting AAA rule, the question remains whether this provision is unenforceable as a matter of public policy under the circumstances of this case. There is no dispute that the parties' arbitration agreement is governed by the Federal Arbitration Act (9 USC § 1 *et seq.* [FAA]). The Supreme Court has held that the FAA manifests a "liberal federal policy favoring arbitration agreements" (*Gilmer v Interstate/Johnson Lane Corp.*, 500 US 20, 25 [1991] [internal quotation marks omitted]; *see also Volt Information Sciences, Inc. v Board of Trustees of Leland Stanford Junior Univ.*, 489 US 468, 479 [1989]). It reflects "Congress' recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation" (*Vera v Saks & Co.*, 335 F3d 109, 116 [2d Cir 2003], quoting *Deloitte Noraudit A/S v Deloitte Haskins & Sells, U.S.*, 9 F3d 1060, 1063 [2d Cir 1993]). The policy is not absolute.

The Supreme Court has made clear that arbitration agreements are only enforceable "[s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum" (*Gilmer*, 500 US at 28 [internal quotation marks omitted]). In *Green Tree Financial Corp-Ala. v Randolph* (531 US 79 [2000]), the Supreme Court, applying *Gilmer*, recognized that "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum" (*id.* at 90). The Court balanced the concerns over cost with the presumption in favor of arbitration by holding that the plaintiff had the burden of demonstrating the "likelihood" of incurring prohibitive costs (*id.* at 92). The Court, however, declined to set forth the detail with which a party must make such a showing. It did hold that the mere risk of such "prohibitive costs is too speculative to justify the invalidation of an arbitration agreement" (*id.* at 91).

The majority of the federal circuit courts that have had occasion to apply *Green Tree*'s burden-shifting approach to claims of prohibitively expensive arbitration fees have endorsed the approach taken in *Bradford v Rockwell Semiconductor Sys., Inc.* (238 F3d 549 [2001]), where the Fourth Circuit held that in the employment discrimination context the courts should engage in a case-by-case analysis focused on "the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether the cost differential is so substantial as to deter the bringing of claims" (*id.* at 556; *see Musnick v King Motor Co. of Fort Lauderdale*, 325 F3d 1255, 1259 [11th Cir 2003], citing, inter alia, *Thompson*

*v Irwin Home Equity Corp.*, 300 F3d 88 [1st Cir 2002]; *Blair v Scott Specialty Gases*, 283 F3d 595, 610 [3d Cir 2002]; *Primerica Life Ins. Co. v Brown*, 304 F3d 469, 471 n 1 [5th Cir 2002]; *Gannon v Circuit City Stores, Inc.*, 262 F3d 677, 683 [8th Cir 2001]; and *LaPrade v Kidder, Peabody & Co., Inc.*, 246 F3d 702, 708 [DC Cir 2001]; *see also James v McDonald's Corp.*, 417 F3d 672, 680 [7th Cir 2005]). This case-by-case approach primarily involves comparing the financial means of the aggrieved employee to the costs associated with arbitrating the dispute, while relying on the fact that in the judicial forum a litigant pays only a minimal fee and does not have to pay for other services pertaining to the adjudication of the matter (*see Spinetti v Service Corp. Intl.*, 324 F3d 212, 218 [3d Cir 2003]; *Shankle v B-G Maintenance Mgt. of Colo., Inc.*, 163 F3d 1230, 1234 [10th Cir 1999]). While the Second Circuit has not addressed the issue, most federal district courts in this state have also adopted the Fourth Circuit's case-by-case analysis focusing on the claimant's ability to pay the expected arbitration fees and costs (*see e.g. Equal Empl. Opportunity Commn. v Rappaport, Hertz, Cherson & Rosenthal, P.C.*, 448 F Supp 2d 458, 463 [ED NY 2006], citing, inter alia, *In re Currency Conversion Fee Antitrust Litig.*, 265 F Supp 2d 385, 411 [SD NY 2003]; *Stewart v Paul, Hastings, Janofsky & Walker, LLP*, 201 F Supp 2d 291, 293 [SD NY 2002]; and *Mildworm v Ashcroft*, 200 F Supp 2d 171, 179 [ED NY 2002]). Such an analysis is consistent with the *Green Tree* decision in that it requires much more than an abstract and speculative risk of high cost; instead, it requires a showing of individualized prohibitive expense.

The New York Court of Appeals applied this case-by-case approach when it recently held in *Matter of Schreiber v K-Sea Transp. Corp.* (9 NY3d 331 [2007]) that a $10,000 cost of arbitration before the AAA was prohibitively expensive. Schreiber was injured while serving as a seaman in the employ of K-Sea. The Jones Act permitted Schreiber to sue K-Sea if its negligence caused his injury. Schreiber, however, entered into a post injury agreement with K-Sea to arbitrate his claims before the AAA, rather than to litigate in court. The agreement provided, among other things, that "[a]ny filing fee, up to $750.00 and any deposit for compensation of the arbitrators shall be advanced by K-Sea, subject to subsequent allocation" (*id.* at 335). When Schreiber brought a suit against K-Sea, asserting a cause of action for violation of the Jones Act, K-Sea filed a demand for arbitration with the AAA. When the AAA

arbitrator demanded payment of a $10,000 fee, K-Sea responded with payment of $750 and notification that the remainder was to be provided by Schreiber (*id.*).

Schreiber moved for a court order staying the AAA arbitration, which Supreme Court granted. While rejecting Schreiber's claim that the FAA rendered the agreement unenforceable, the motion court held that K-Sea had failed to prove " 'that there was no deception or coercion on its part, and that Schreiber understood his obligations under the agreement' " (*id.* at 336). On appeal, this Court, one Justice dissenting in part, reversed and directed a hearing at which K-Sea would have the burden to show that the agreement was fairly procured (*id.*). The Court of Appeals modified so as to place on Schreiber the burden of showing, at the hearing, that he was deceived by K-Sea to enter into the agreement to arbitrate (*id.* at 340-341).

As it pertains to the issue herein, the Court of Appeals in *Schreiber*, like the dissent in this Court, viewed the cost of arbitration payable by Schreiber under the agreement, at least $9,250, as prohibitively expensive. Thus, it held, "any order compelling arbitration should be conditioned on K-Sea's agreement to bear any costs not waived by the AAA subject later to reallocation of those costs by the arbitrator" (*id.* at 341).

Here, as in *Schreiber*, the risk of prohibitive arbitration cost was more than speculative. Indeed, the record is abundantly clear that the arbitration clause requiring Brady to share half the cost of the arbitrator's compensation would require her to bear a significant arbitration cost—$21,150. While this amount alone is substantial, it did not include other arbitration fees and costs that would have to be borne equally by the parties. Moreover, Brady has provided sufficient information about her precarious financial situation. At the time she sought a court order to compel arbitration, Brady had not been gainfully employed for the 18-month period following her termination by Williams. A $21,150 cost may not seem onerous in light of Brady's earning history, ranging from $100,000 to $405,000 during her five-year period of employment with Williams. Yet, Brady was terminated and no longer commands such a yearly salary. In fact, it is undisputed that, at the time of the arbitration, she was still unemployed. Thus, contrary to Supreme Court's determination, Brady adequately carried her burden of demonstrating that she was not in a position to afford the cost associated with the arbitration, and was therefore effectively precluded from vindicating her rights in the AAA forum.

While the dissent cannot—and does not—dispute that the fee-splitting provision with regard to the arbitrator's compensation requires Brady to bear a substantial cost for submitting her discrimination claims to arbitration, the dissent attempts to minimize the effect of such high cost by making us believe that the alternative litigation cost would be much higher. We cannot agree. It is common knowledge that an employee filing an employment discrimination claim in the federal courts must pay a minimal filing fee, generally only a few hundred dollars. Also, the costs of maintaining and operating the court system, including the salaries of judges and other court employees, are borne by the taxpayers, not the litigants themselves. While the employee filing in court is likely to incur the costs of legal representation, her attorneys may be likely to take the case on a contingency fee basis. Also, if the employee's suit is successful, the remedies available under federal antidiscrimination legislation include the award of attorney's fees. Thus, in general, it cannot be disputed that the out-of-pocket expenses for an employee filing a legal suit are minimal.

Moreover, despite the fact that the likelihood of prohibitive cost is apparent from Brady's financial situation, due to her long-term unemployment, and the substantial arbitration cost relative to litigation, the dissent would require more documentary evidence in the form of bank statements and bills. What the dissent ignores is that the likelihood of prohibitive cost is based on these same facts that have not been disputed. Indeed, Williams does not challenge Brady's assertion that her share of the arbitration cost is prohibitively expensive due to her current financial situation created by her long-term unemployment. Instead, Williams argues that the *Bradford* case by-case analysis does not apply where, as here, the employee seeks to compel arbitration. Specifically, Williams argues that the public policy concerns of prohibitive arbitration costs are only applicable where the employer seeks to force arbitration on an employee who has selected a court as the forum to arbitrate an employment discrimination claim. We reject that argument. The procedural context in which the issue of Brady's financial means arises is not significant since Brady was bound to arbitrate her employment claims before the AAA pursuant to the employment agreement. The same public policy concerns—Brady's ability to litigate her statutory rights—would have been at issue regardless of whether it was Brady or Williams who initiated the arbitration proceedings. Thus, as a party aggrieved by the

fee-splitting provision, Brady was within her rights to apply for an order compelling arbitration and raise the fee-splitting issue within a CPLR article 75 proceeding.

Significantly, in summarily rejecting Brady's claim that the significant arbitration fee precluded or substantially deterred her from pursuing her statutory rights due to her current financial situation, Supreme Court never examined the arbitrator's costs under the provision at issue and their impact on the particular plaintiff in the case. Instead, the court improperly relied on *Arakawa v Japan Network Group* (56 F Supp 2d 349 [SD NY 1999]), which is clearly distinguishable from this case. In that case, as in *Green Tree Financial Corp.-Ala.* (531 US 79 [2000], *supra*), the risk of prohibitive cost was too speculative to justify invalidating the arbitration agreement. Specifically, the court stated that it could not conclude that the payment of fees would be a barrier to the vindication of Arakawa's statutory rights since "[a]t this point in the litigation it is not clear how large the fees of the arbitration will be or whether plaintiff will be required to pay any portion of it" (*id.* at 355). Here, in contrast, Brady has been asked to pay $21,150 to cover the cost of the arbitrator, with potentially more arbitration costs to come. Thus, as in *Schreiber*, here the risk of prohibitive costs was not speculative.

Contrary to Williams's contention, the appropriate remedy is to sever the improper provision of the arbitration agreement, rather than void the entire agreement and force Brady to pursue her claims in state or federal court. Not all courts have been as hostile to severing unenforceable cost-splitting clauses from arbitration agreements as the dissent would have us believe (*Spinetti v Service Corp. Intl.*, 324 F3d 212 [3d Cir 2003]). On the contrary, most other courts, like our own Court of Appeals in *Schreiber*, have adopted such an approach as presumably consistent with the state and federal policy favoring arbitration (*see e.g. Howard v Anderson*, 36 F Supp 2d 183, 187 [SD NY 1999]; *Res v Masterworks Dev. Corp.*, 5 Misc 3d 1003[A], 2004 NY Slip Op 51169[U] [2004]; *Phillips v Associates Home Equity Servs., Inc.*, 179 F Supp 2d 840, 844-845 [ND Ill 2001]; *see also Spinetti v Service Corp. Intl.*, 324 F3d 212, 218 [3d Cir 2003]; *Carter v Countrywide Credit Indus., Inc.*, 362 F3d 294, 297 [5th Cir 2004]).

More importantly, the arbitration agreement herein contains an explicit clause providing that the rendering of any provision void or unenforceable "shall not affect the validity of the

remainder of the Agreement." Thus, by nullifying the objectionable part of the arbitration agreement, this Court will not be overriding the intent of the parties to arbitrate, albeit subject to the AAA rule that the employer shall pay the cost of arbitration subject later to reallocation of those costs by the arbitrator. Contrary to the dissent's arguments, this holding is consistent with the U.S. Supreme Court's position favoring arbitration, as set forth in cases like *Gilmer* and *Green Tree*. The rationale of these cases is that the arbitration approach provides an effective forum for vindication of an employee's statutory rights, and that the only effect of an arbitration agreement is to transfer adjudication of those rights from a judicial to an arbitral forum. However, requiring potential claimants, like Brady, to pay significant costs up front is likely to deter them from bringing a claim. Requiring litigation under Brady's circumstances is clearly not consistent with the assumption of arbitral accessibility underlying *Gilmer* and its progeny. Nor is it consistent with the social policy of the employment discrimination statutes.

In sum, while we find that the fee-splitting clause of the arbitration agreement governs over the conflicting arbitration compensation rule of the AAA, public policy dictates that we not enforce its fee-splitting provision under the circumstances of this employment discrimination claim. Brady has met her burden of establishing that the arbitration fees and costs are so high as to discourage her from vindicating her state and federal statutory rights in the arbitral forum, rendering the subject arbitration clause unenforceable (*Green Tree Financial Corp.-Ala.*, 531 US at 90; *Schreiber*, 9 NY3d at 341). The imposition of such significant costs as a condition of vindicating her statutory rights is not a reasonable substitute for a judicial forum. In light of this disposition, we need not reach Brady's argument that the AAA should be compelled to enter a default against Williams.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Nicholas Figueroa, J.), entered July 13, 2007, denying the petition and dismissing the proceeding brought pursuant to CPLR article 78 to compel respondent American Arbitration Association to enter a default judgment against petitioner's former employer, respondent The Williams Capital Group, L.P., and, pursuant to CPLR 7503, to compel Williams to pay the arbitration fees, should be reversed, on the law, and the petition granted to the extent of directing Williams to pay the arbitration fees, subject later to reallocation of those costs by the arbitrator.

McGuire, J. (dissenting in part). Except in one respect discussed below, I agree with the majority's conclusion that the American Arbitration Association's (AAA) "employer-pays" rule does not supersede the fee-splitting provision of the parties' arbitration agreement. With respect to this issue the majority essentially adopts Justice Figueroa's excellent analysis of the issue in his written decision. The majority's conclusion is compelled by well-settled precedent holding that "arbitration agreements are contracts and must be interpreted under the accepted rules of contract law" (*Matter of Salvano v Merrill Lynch, Pierce, Fenner & Smith*, 85 NY2d 173, 182 [1995]). In *Salvano*, the Court of Appeals rejected the argument that Merrill Lynch could be compelled to submit to expedited arbitration of disputes with former employees even though the arbitration agreement contained no provision for expedited arbitration. As the Court stated, "[t]o read into the [agreement] a provision authorizing compulsory expedited arbitration would be to fundamentally modify the terms of the parties' contract and force [Merrill Lynch] to arbitrate in a manner contrary to the agreement to which it has assented" (*id.*). Accordingly, the majority correctly concludes that "[t]o read into the arbitration agreement the AAA rule that the employer pays the arbitrator's compensation would be to fundamentally modify the terms of the agreement and to force Williams to arbitrate in a manner contrary to the agreement to which it had assented" (internal quotation marks omitted).

I part company with the majority's conclusion that the fee-splitting provision should be invalidated as violative of public policy, and with its resulting directive that Williams pay all the arbitration fees, albeit subject ostensibly to later reallocation by the arbitrator. As discussed below, we should not decide whether the fee-splitting provision is unenforceable as Brady is not in any event entitled to such a directive. Even if it were appropriate to decide whether the fee-splitting provision is violative of public policy because its enforcement would likely be prohibitively expensive for Brady, the majority's analysis is flawed. Brady has not met her burden on this issue as she failed to present any facts bearing on such critical matters as the extent of her financial resources and the extent to which the costs that she would incur if the fee-splitting provision were enforced would exceed the costs she would incur if she litigated her claims in court.

## A

Although I agree generally with the majority's conclusion that the fee-splitting provision of the agreement trumps the "employer-pays" rule, one of Brady's arguments warrants fuller discussion. Doing so, moreover, will help explain my one point of disagreement with the majority.

At the time the arbitration agreement was entered into, rule 39 of the AAA's National Rules for the Resolution of Employment Disputes (the National Rules) provided that the arbitrator's compensation "shall be borne equally by the parties, unless they agree otherwise, or unless the law provides otherwise." Further, a provision of the "Administrative Fee Schedule," which is incorporated into the National Rules by rule 38, states that "[a]rbitrator compensation is not included in this schedule" and that "[u]nless the parties agree otherwise, arbitrator compensation and administrative fees are subject to allocation by the arbitrator in the award." By contrast, at the time Brady sought arbitration, a provision of the "Costs of Arbitration" section of the National Rules, incorporated into rule 44, "Neutral Arbitrator's Compensation," stated that for disputes such as this one arising out of "Employer-Promulgated Plans," as opposed to "Individually-Negotiated Employment Agreements and Contracts," "[t]he employer shall pay the arbitrator's compensation unless the employee, post dispute, voluntarily elects to pay a portion of the arbitrator's compensation." When disputes arise out of "Employer-Promulgated Plans," neither arbitrator compensation nor administrative fees are subject to reallocation by the arbitrator except upon a determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous.[1] In addition, for such disputes, the employer pays the administrative fee of $300 for each day of hearings held before the arbitrator or arbitrators.

---

1. In addition, "[a]ll expenses of the arbitration, including required travel and other expenses . . . as well as the costs relating to proof and witnesses produced at the direction of the arbitrator, shall be borne by the employer." These expenses are not subject to reallocation under any circumstances. Rather, only a narrow class of expenses, hearing room rental fees and administrative fees, is subject to reallocation by the arbitrator, but only "upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous." Under the applicable rules when the arbitration agreement was entered into, however, these expenses were "borne equally by the parties, unless they agree otherwise or unless the arbitrator directs otherwise in the award."

As the majority notes, both when the arbitration agreement was entered into and when Brady sought arbitration, rule 1 of the National Rules provided as follows:

> "The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association . . . or under its National Rules for the Resolution of Employment Disputes. If a party establishes that an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules."

Another provision of rule 1, however, one the majority does not quote or discuss, also is relevant. At both relevant times rule 1 also went on to state that "[t]hese rules, and any amendment of them, shall apply in the form obtaining at the time the demand for arbitration . . . is received by the AAA."

This latter provision should be deemed to have been incorporated into the arbitration agreement, the parties having expressly agreed to arbitration under the "then-current" AAA rules for employment disputes, i.e., the rules "obtaining," i.e., in effect, at the time arbitration was demanded (*see This Is Me, Inc. v Taylor*, 157 F3d 139, 143 [2d Cir 1998] ["New York law requires that all writings which form part of a single transaction and are designed to effectuate the same purpose (must) be read together, even though they were executed on different dates and were not all between the same parties"]).

Nonetheless, Brady's reliance on rule 1 is misplaced for the same reason her reliance on the provision of the agreement providing for the application of the "then-current" version of the rules is misplaced: both of these provisions are general. Although the parties undoubtedly could have agreed in all-inclusive terms to be bound by any and all subsequent rule changes, they did not do so. Rather, these general provisions must be read together with the specific provision of the agreement itself specifying that "[Williams] and I shall equally share the fees and costs of the Arbitrator" (*see HGCD Retail Servs., LLC v 44-45 Broadway Realty Co.*, 37 AD3d 43, 49 [2006]). Under well-settled principles of contract interpretation, "[e]ven if there [is] an inconsistency between a specific provision and a general provision of a contract . . . , the specific provision controls" (*Muzak Corp. v Hotel Taft Corp.*, 1 NY2d 42, 46 [1956]).

My one disagreement with the majority on this issue now can be brought into focus. As noted immediately above, the agreement specifically provides for equal sharing of the "fees and costs of the *Arbitrator*" (emphasis added), not the "fees and costs of the *Arbitration*." This specific provision does not conflict with the provisions of the National Rules in effect at the time of the arbitration specifying that the employer bears all the other costs, expenses and fees (other than a nominal filing fee that is payable when an employee files a claim) of the arbitration. Accordingly, I do not agree with the majority that the relevant provisions of the agreement "are clear and unambiguous as to the parties' intent to share the cost of the arbitrator's compensation."[2] Rather, I would give effect to the plain and unambiguous language of the fee-splitting provision and, reading it together with the applicable provisions of the National Rules, conclude that only the fees and costs of the arbitrator must be shared equally.[3]

## B

With respect to its directive that Williams pay all the arbitration fees, the majority fails to appreciate the tension between its

**2.** Similarly, the majority states that while the amount of Brady's share of the arbitrator's fee is substantial, "it [does] not include other arbitration fees and costs that would have to be borne equally by the parties." Elsewhere in its opinion, however, the majority appears to agree with me in this regard by, for example, referring to the parties' agreement "to equally share the *arbitrator's compensation*" (emphasis added). In any event, as noted above, the majority is wrong in broadly asserting that "other arbitration fees and costs . . . would have to be borne equally by the parties."

**3.** Brady argues that the AAA expressly rejected Williams' position that the fee-splitting provision trumps the "employer-pays" rule and that this determination is not subject to judicial review. This argument, however, is advanced not in her main brief but in her reply brief and I would reject it for this reason alone (*see Givoldi, Inc. v United Parcel Serv.*, 286 AD2d 220 [2001]). In any event, it is without merit. In support of this argument, Brady cites to communications from the AAA case manager, not the arbitrator (*see Matter of Kingsley v Redevco Corp.*, 61 NY2d 714, 715 [1984] [the question of whether an arbitration rule "was complied with is one for the *arbitrators* to decide and is not subject to (judicial) review" (emphasis added)]). Moreover, those communications are at least equivocal, particularly in light of the submissions by the parties to the case manager. Finally, the only communication from the arbitrator bearing on this issue came after the communications from the case manager and cannot reasonably be construed to have rejected Williams' position. In an order dated September 20, 2006, the arbitrator informed the parties that the arbitration was suspended as deposits for arbitrator compensation and administrative fees had not been received even though "[t]he *parties* were directed to deposit such sums" by earlier dates (emphasis added).

position and *Salvano*, for the effect of its directive is to "fundamentally modify the terms of the agreement and to force Williams to arbitrate in a manner contrary to the agreement to which it had assented." The majority thereby directs on the basis of a public policy ground that Williams do precisely what it concludes Williams cannot be compelled to do consistently with first principles of contract law. To explain my substantive disagreement with the majority's directive, a review of the relevant federal cases is necessary.

In *Gilmer v Interstate/Johnson Lane Corp.* (500 US 20 [1991]), Gilmer brought an action in federal district court asserting age discrimination claims against Interstate, his former employer. The district court denied Interstate's motion to compel arbitration pursuant to a rule of the New York Stock Exchange to which Gilmer had agreed, and the Fourth Circuit reversed (*id.* at 24). The Supreme Court affirmed, rejecting Gilmer's argument that he could be compelled to forgo his statutory right to seek judicial review of his claims. In affirming, the Supreme Court reaffirmed its prior holding that " '[s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function' " (*id.* at 28, quoting *Mitsubishi Motors Corp. v Soler Chrysler-Plymouth, Inc.*, 473 US 614, 637 [1985]).

In *Green Tree Financial Corp.-Ala. v Randolph* (531 US 79 [2000]), Randolph brought an action in federal district court asserting claims under a federal statute and the district court granted Green Tree's motion to compel arbitration. The Supreme Court reversed the Eleventh Circuit's conclusion that the arbitration agreement "posed a risk that [Randolph's] ability to vindicate her statutory rights would be undone by 'steep' arbitration costs, and therefore was unenforceable" (*id.* at 84). The Court noted that "[i]t may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum" (*id.* at 90). The Court held, however, that "where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs" (*id.* at 92), and that Randolph did not meet that burden (*id.*). Nothing in the Court's opinion remotely suggests that in the event Randolph had met that burden, the remedy would be to relieve her of those costs in the

arbitral forum, rather than deny the motion to compel arbitration and thereby permit her to continue to exercise her right to seek redress in the courts.

In *Bradford v Rockwell Semiconductor Sys., Inc.* (238 F3d 549 [2001]), the Fourth Circuit rejected the claim that when statutory rights would be subject to arbitration pursuant to an otherwise valid arbitration agreement, fee-splitting provisions are per se invalid. Rather, the court held that

"the appropriate inquiry is one that evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, i.e., a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims" (*id.* at 556).

The majority correctly adopts this approach and correctly notes that a slew of other federal circuit courts of appeals have adopted it.

The majority concludes that Brady met her burden of showing that arbitration would be prohibitively expensive due to the fee-splitting provision. As discussed below, I would not reach that issue. But even if the majority were correct—I argue below that it is not—the majority nonetheless errs. Where the majority goes astray is in failing to appreciate that under this approach the issue is whether, given the costs attendant to a fee-splitting provision, the arbitral forum is "an adequate and accessible substitute to *litigation*" (*id.* [emphasis added]), which turns in part upon "the expected cost differential between arbitration *and litigation in court*" (*id.* [emphasis added]). Whenever the costs of arbitration in a particular case are prohibitively expensive relative to litigation, it makes no sense to conclude that the resulting *invalidation* of a fee-splitting provision is itself a sufficient basis to authorize courts to do what they otherwise cannot do: through an act of judicial reformation "fundamentally modify the terms of the parties' contract and force [one party] to arbitrate in a manner contrary to the agreement to which it has assented" (*Salvano*, 85 NY2d at 182). The fee-splitting provision is unenforceable because it would prevent a party alleging violations of federal rights from vindicating those rights either in an arbitral forum or in court. Putting aside the possibility that other principles of contract law (which

I discuss below) may lead to a different conclusion, the more sensible remedy is not to rewrite the arbitration agreement but to disregard it, restoring the aggrieved party to the status quo ante and thereby permitting that party to litigate his or her claims in court.

For these reasons, I submit that it is not surprising that there is no suggestion in *Green Tree* that the appropriate remedy is to excise the offending costs provision of the arbitration agreement. Nor is there any such suggestion in *Bradford* or, with two exceptions,[4] in any of the other decisions the majority cites by the federal circuit courts of appeals that follow *Bradford*. Moreover, the majority's position is undermined by two employment discrimination cases decided before *Green Tree* and *Bradford*, one by the Tenth Circuit and the other by the D.C. Circuit.

Indeed, *Shankle v B-G Maintenance Mgt. of Colo., Inc.* (163 F3d 1230 [1999]) expressly contradicts the majority's position. In *Shankle*, the Tenth Circuit concluded that a fee-splitting provision essentially identical to the one at issue here "placed Mr. Shankle between the proverbial rock and a hard place—it prohibited use of the judicial forum, where a litigant is not required to pay for a judge's services, and the prohibitive cost substantially limited use of the arbitral forum" (*id.* at 1235). Far from suggesting that the appropriate remedy was to excise the fee-splitting provision, the court expressly rejected the argument that the court "should 'redline' the fee-splitting provision and compel arbitration" (*id.* at 1235 n 6). The court rejected that argument because the fee-splitting provision "clearly makes the employee responsible for one-half of the arbitrator's fees and we are not at liberty to interpret it otherwise" (*id.*).

Furthermore, the court rejected this argument even though it was advanced by the *employer* in an attempt to defeat the employee's claim that he was entitled to arbitration. Regardless of whether, by failing to insist that arbitration under terms to which it had not agreed could not be compelled, the employer had waived any claim that litigation was the employee's sole remedy—the court did not discuss this question of state law—in this case the employer is urging that litigation is Brady's sole remedy precisely because it insists that it cannot be compelled to arbitration under terms to which it did not agree. Although

4. As discussed below, the two exceptions, *Spinetti v Service Corp. Intl.* (324 F3d 212 [3d Cir 2003]) and *Gannon v Circuit City Stores, Inc.* (262 F3d 677 [8th Cir 2001]), provide only superficial support for the majority's position.

that principle of contract law is the substance behind Williams' position, the majority makes it disappear by characterizing Williams' position as one founded only on the "procedural posture" of this case.

*Cole v Burns Intl. Sec. Servs.* (105 F3d 1465 [DC Cir 1997]) implicitly contradicts the majority's position. The D.C. Circuit affirmed the district court's grant of the employer's motion to compel arbitration despite "hold[ing] that Cole could not be required to agree to arbitrate his public law claims as a condition of employment if the arbitration agreement required him to pay all or part of the arbitrator's fees and expenses" (*id.* at 1485). The court, however, found the arbitration agreement "valid and enforceable" because it "interpret[ed] the agreement as requiring Burns Security to pay all of the arbitrator's fees necessary for a full and fair resolution of Cole's statutory claims" (*id.*). In this regard, the court stressed that there was "no clear allocation of responsibility for payment of arbitrator's fees" under the agreement, and relied on the principle of contract interpretation that "where a contract is unclear on a point, an interpretation that makes the contract lawful is preferred to one that renders it unlawful" (*id.*). Here, however, as in *Shankle*, the fee-splitting provision is unambiguous. Accordingly, if it imposes prohibitive costs on Brady it cannot be enforced by interpreting it to make Williams responsible for more than one half of the arbitrator's fees and costs.

The flaw in the majority's position is highlighted by its consequences. In some cases—given the state of the record, this case may be one of them—to excise or modify a fee-splitting provision will reduce the costs of the arbitration for the party resisting enforcement of the provision to an amount that is less, substantially less in at least some cases, than that party would incur in litigation. That is an incongruous result given that the rationale for invalidating the fee-splitting provision is that it imposes prohibitively greater costs than those that would be incurred in litigation. The correct remedy, permitting the party aggrieved by the fee-splitting provision to litigate in court his or her claims, is implicit in the rationale for invalidating such a provision.

By contrast, the majority's approach, as Justice Figueroa recognized in his written decision, "would bestow an unforeseen windfall" on the party resisting enforcement of the fee-splitting provision and "saddl[es the party seeking its enforcement] with an unexpected liability which it sought to avoid." These

consequences, to say the least, cannot readily be reconciled with the intent of the parties to share equally the "fees and costs of the Arbitrator." Notably, the majority does not deny that these consequences are inherent in its position, that they are incongruous or that they are at odds with the intent of the parties.

Although the majority believes that *Matter of Schreiber v K-Sea Transp. Corp.* (9 NY3d 331 [2007]) supports its position, the opposite is true. The Court concluded that it was possible for a factfinder to conclude that K-Sea, the employer, had deceived Schreiber into signing the arbitration agreement because it might reasonably be inferred from a provision stating that K-Sea would advance any filing fee up to $750 that the fee was likely to be $750 or less, rather than the fee actually demanded of $10,000 (*id.* at 340). Accordingly, the Court directed a hearing on the issue of whether Schreiber had been deceived. The Court then went on to state as follows:

> "If Schreiber fails to show at the hearing that K-Sea obtained his agreement by intentionally deceiving him, Supreme Court should compel arbitration. Even in that event, however, Schreiber should not be compelled to bear costs which would effectively preclude him from pursuing his claim (*see Green Tree Financial Corp.-Ala. v Randolph*, 531 US 79, 92 [2000]). Thus, any order compelling arbitration *should be conditioned on K-Sea's agreement to bear any costs not waived by the AAA,* subject later to reallocation of those costs by the arbitrator" (*id.* at 341 [emphasis added]).

The reason any such order should be conditioned on K-Sea's *agreement* to bear those costs is apparent: K-Sea did not agree to bear them in the arbitration agreement and courts may not "fundamentally modify the terms of the parties' contract and force [a party] to arbitrate in a manner contrary to the agreement to which it has assented" (*Salvano*, 85 NY2d at 182).

The majority does not come to grips with my analysis of *Schreiber.* Indeed, it ignores the express statement in *Schreiber* that "any order compelling arbitration should be conditioned on K-Sea's agreement to bear any costs not waived by the AAA" (9 NY3d at 341). Although the conditional nature of that possible order is inconsistent with the majority's position, it nonetheless asserts that in *Schreiber* the Court of Appeals "adopted" the approach of "severing unenforceable cost-splitting clauses from arbitration agreements." Nor does the majority come to grips

either with the express rejection of its approach by the Tenth Circuit in *Shankle* or with *Shankle*'s rationale, grounded in fundamental principles of contract law, that to " 'redline' the fee-splitting provision and compel arbitration" would entail an impermissible judicial alteration of unambiguous contract terms (163 F3d at 1235 n 6).

As noted above, I recognize that other principles of contract law might support the conclusion that the fee-splitting provision can be severed from the arbitration agreement. Thus, the majority also relies on a severability clause in the arbitration agreement, which provides that "[i]f any provision of this Agreement is adjudged to be void or otherwise unenforceable, in whole or in part, such adjudication shall not affect the validity of the remainder of the Agreement." On the basis of the apparent facial meaning of the clause's terms, the majority argues that "by nullifying the objectionable part of the arbitration agreement, this Court will not be overriding the intent of the parties to arbitrate, albeit subject to the AAA rule that the employer shall pay the cost[s] of arbitration." If the majority can rely on the severability clause, its disposition of this appeal is dependent nonetheless on the correctness of its conclusion that the fee-splitting provision is unenforceable, an issue to which I will soon turn.

The effect of the severability clause, however, is not properly before this Court. Brady mentions the clause for the first time in her reply brief (and, for that matter, only in a short footnote). Moreover, there is no indication in the record on appeal that the severability clause or its possible import was raised before Supreme Court: it is not mentioned in the petition; in the affidavit of Brady's counsel in support of her order to show cause seeking, among other things, to enjoin the AAA from dismissing the arbitration; in the transcript of the oral argument before Justice Figueroa; in the post-argument letter submissions of the parties; or in Justice Figueroa's written decision. For these reasons alone, the severability clause and its significance are not properly before this Court (*see Murray v City of New York*, 195 AD2d 379, 381 [1993]; *Recovery Consultants v Shih-Hsieh*, 141 AD2d 272 [1988]). Furthermore, the meaning and effect of a severability clause do not present a pure question of law (*see Matter of Wilson*, 50 NY2d 59, 65 [1980] [observing with respect to a severability clause that "whether the provisions of a contract are severable depends largely upon the intent of the parties as reflected in the language they employ

and the particular circumstantial milieu in which the agreement came into being"]). Because Williams has not had an opportunity to address either the intent of the parties in light of the language of the severability clause or the "particular circumstantial milieu," we should resolve this appeal without reference to it (see *McGarr v Guardian Life Ins. Co. of Am.*, 19 AD3d 254 [2005]; *Ta-Chotani v Doubleclick, Inc.*, 276 AD2d 313 [2000]).

The majority makes no effort to defend its implicit position that the import of the severability clause is properly before us. Its argument that excision of the fee-splitting clause and implementation of the AAA "employer-pays" rule would be consistent with the parties' intention to arbitrate simply assumes the answer to the critical question. To be sure, nullification would not "overrid[e] the intent of the parties to arbitrate." But the vital question is whether Williams would have agreed to arbitrate at all before the AAA without the provision of the agreement—which must be presumed to reflect the intent of the parties (see *Slamow v Del Col*, 79 NY2d 1016 [1992])—providing for equal sharing of the "fees and costs of the Arbitrator." For the same reason, the majority's reliance in this regard on the federal policy favoring arbitration of disputes is misplaced. That important policy is irrelevant unless a valid agreement to arbitrate exists (see *TNS Holdings v MKI Sec. Corp.*, 92 NY2d 335, 339 [1998]).

Against the backdrop of the severability clause, I turn to the two decisions by the federal circuit courts of appeals cited by the majority that provide only superficial support for its position.[5] In *Spinetti*, the Third Circuit affirmed the district court's

---

5. The two district court decisions the majority cites, *Howard v Anderson* (36 F Supp 2d 183 [SD NY 1999]) and *Phillips v Associates Home Equity Servs., Inc.* (179 F Supp 2d 840 [ND Ill 2001]), provide the majority with no support at all. In *Howard*, the court rejected a claim by an employee arbitrating her discrimination claims against her former employer that the employer should be directed to pay virtually all of the fees associated with the arbitration; the court did not sever any provision of the arbitration agreement (36 F Supp 2d at 186-187). In *Phillips*, the district court concluded that Phillips, who had brought suit alleging violations by the defendants of federal laws relating to residential mortgage transactions, had met her burden of showing that the cost-allocation provision of the arbitration would be prohibitively expensive (179 F Supp 2d at 847). Accordingly, the court denied the defendants' motion to compel arbitration (*id.*). Far from severing the cost-allocation provision and directing arbitration, the court stated that "[i]n the event . . . that defendants were to agree to bear the costs associated with the arbitration, the Court would be willing to entertain a motion to reconsider its

*(n. cont'd)*

order granting the employer's motion to compel arbitration of Spinetti's discrimination claims. The Third Circuit held that "[t]he district court properly determined that the proviso [of the arbitration agreement] requiring each party to pay its own attorney's fees—regardless of the outcome of the arbitration—runs counter to statutory provisions under Title VII and ADEA that permit an award of attorney's fees and costs to a prevailing party" (324 F3d at 216). In sharp contrast to this case, Spinetti, not the employer, claimed on appeal "that inasmuch as the attorney's fees and costs provision is deemed contrary to law, the court should have voided the entire arbitration agreement instead of merely trimming its offensive portions" (*id.* at 215). Because the validity of arbitration agreements is a question of state law, the court looked to Pennsylvania law in resolving Spinetti's claim. The court rejected it and wrote as follows:

> "Pennsylvania law supports the actions of the district court in referring Spinetti's employment discrimination dispute to arbitration and striking the agreement's illegal provisions. Under Pennsylvania law, a court of equity may not only remove an offensive term, but may supply a new, limiting term and enforce the covenant so modified. *This unique power to modify the parties' contract . . .* arises from the general equity powers of the court" (*id.* at 220 [emphasis added and internal quotation marks omitted]).

*Gannon*, like *Spinetti*, presents the same twist on the facts of this case. There, too, the employer contended that the invalidity of a provision in the arbitration agreement—a provision that limited punitive damages (262 F3d at 679 n 2)—should be severed from the agreement and the employee, Gannon, "should be compelled to arbitrate her claims [of sexual harassment, sex discrimination and retaliation] under the remaining terms of the agreement" (*id.* at 679). Gannon, however, "argue[d] that the invalid provision renders the entire agreement unenforceable as a matter of public policy" (*id.* at 680). The Eighth Circuit reversed the district court's conclusion that "the invalid provision rendered the entire arbitration agreement unenforceable"

---

ruling [denying the motion to compel arbitration] on that basis" (*id.*). As is evident, *Phillips* undercuts rather than supports the majority's position. *Res v Masterworks Dev. Corp.* (5 Misc 3d 1003[A], 2004 NY Slip Op 51169[U] [2004]), also cited by the majority, is indistinguishable from *Phillips* and thus it, too, undercuts the majority's position.

(*id.* at 678), relying in part on a severability clause in the agreement, but also on "Missouri contract law [that] declares severance to be proper in this instance" (*id.* at 680). The court thus ruled that

> "[t]he punitive-damages clause represents only one aspect of their agreement and can be severed without disturbing the primary intent of the parties to arbitrate their disputes. '[W]here one provision in a contract, which does not constitute its main or essential feature or purpose, is void . . . but is clearly separable and severable from the other parts which are relied upon, such other parts are not affected by the invalid provision, and may be enforced as if no such provision had been incorporated in the contract.' *Schibi v. Miller*, 268 S.W. 434, 436 (Mo. Ct. App. 1925)" (*id.* at 681).

The first point to be made about *Spinetti* and *Gannon* is that in both cases the party whose ox would be gored by enforcing the arbitration agreement without the invalid provision, the employer, clearly waived any claim that it could not be required to arbitrate under terms to which it had not agreed. After all, the employers in both cases argued that the invalid provision should be severed and the employee should be required to arbitrate.[6]

The second, and more important, point is that *Spinetti* and *Gannon* are grounded squarely in the contract law of, respectively, Pennsylvania and Missouri. Whether New York contract law in this regard is as "unique" as Pennsylvania's (*Spinetti*, 324 F3d at 220), or is sufficiently comparable to Missouri's, need not be debated. For the same reasons that the severance clause is not properly before us, the question of whether New York contract law would permit a court to sever the fee-splitting provision and enforce the remaining provisions of the arbitration agreement also is not properly before us. Brady has never advanced any such argument. Rather, her position was and is

---

**6.** I note that the majority sets a precedent with which at least some employees who otherwise are in the same situation as Brady may be unhappy. If such an employee contends that because of an invalid fee-splitting provision she should be permitted to exercise her right, granted by a federal or state statute or otherwise, to litigate, the majority's approach requires the conclusion that she can be compelled to arbitrate at the election of the employer. It cannot be, after all, that the majority's holding enables claimants but not respondents in arbitration proceedings to insist on arbitration when a fee-splitting provision is found to be invalid.

that the alleged invalidity of the fee-splitting provision ipso facto requires Williams to arbitrate and bear financial burdens to which it never agreed.

There is New York law on point (*see e.g. Triggs v Triggs*, 46 NY2d 305 [1978]; *Artache v Goldin*, 133 AD2d 596 [1987]) and it only underscores the point that whether an illegal provision can be severed from a contract so as to permit enforcement of the remaining terms is or at least can be a fact-bound question that cannot be raised for the first time on appeal (*see McGarr, supra; Ta-Chotani, supra*). Thus, in *Triggs*, the majority held that the fact that one portion of an agreement "might have involved illegality provides no compulsion not to enforce the other, legal portion of the agreement where, as here, there has been no factual determination that enforcement of the [legal] stock purchase option was dependent on enforcement of the terms [of questionable legality]" (46 NY2d at 309-310). Here, of course, there has been no factual determination that the agreement to arbitrate was or was not dependent on the fee-splitting provision. Nor does the record permit us to make such a determination. The absence of such a factual determination in this case is attributable only to Brady, the party seeking enforcement of the remaining terms of the agreement, who has simply assumed that the illegality of the fee-splitting provision both entitles her to enforcement of the remaining terms and requires Williams to shoulder financial burdens to which it never agreed. Under these circumstances, it is manifestly unfair to assume that Williams would have agreed to arbitrate even if it were required to pay all the arbitrator's costs and fees despite the express provision that the fee-splitting provision would trump any contrary rule of the AAA.

In *Artache v Goldin*, a panel of the Second Department wrote that "[c]ourts will be particularly ready to sever the illegal components and enforce the other components of a contract where the injured party is less culpable and the other party would otherwise be unjustly enriched by using his own misconduct as a shield against otherwise legitimate claims" (133 AD2d at 599). Of course, Williams has not had any opportunity to address the question of relative culpability or even the question of whether it plausibly can be thought to have any culpability. It must be stressed, moreover, that the fee-splitting provision unquestionably is not per se illegal. To the contrary, as *Bradford* and every case decided after *Bradford* has held—and as the majority recognizes—such a provision is lawful unless the

particular party attacking it meets its burden of demonstrating that it would impose costs that, relative to the costs of litigation, would be prohibitive to that party in light of the party's ability to pay. Furthermore, even assuming Williams sensibly could be thought to have engaged in any misconduct, it has had no opportunity to address the question of whether it would be "unjustly enriched" by not severing the fee-splitting provision. To assume that Williams would be unjustly enriched places on it the burden that Brady must bear of showing that the costs of arbitration would be prohibitively greater than the costs of litigation.[7]

In sum, I would not reach the issue of whether the fee-splitting provision is unenforceable, for Brady is not entitled to the relief she seeks even if it is unenforceable. But if it were proper to reach the issue, I cannot agree with the majority's conclusion that Brady met her burden of showing that she was likely to incur prohibitive costs that would deter her from arbitrating her claims.

## C

As the Fourth Circuit stated in *Bradford*:

> "The cost of arbitration, as far as its deterrent effect, cannot be measured in a vacuum or premised upon a claimant's abstract contention that arbitration costs are 'too high.' Rather, an appropriate case-by-case inquiry must focus upon a claimant's expected or actual arbitration costs and his ability to pay those costs, measured against a baseline of the claimant's expected costs for litigation and his ability to pay those costs" (238 F3d at 556 n 5). As the panel went on to note, "parties to litigation in court often face costs that are not typically found in arbitration, such as the cost of longer proceedings and more complicated appeals on the merits" (*id.*; *see also Rosenberg v Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F3d 1, 16 [1st Cir 1999] ["arbitration is often far more affordable to plaintiffs and defendants alike than is pursuing a claim in court"]);

---

**7.** Given the inadequacy of Brady's showing, as discussed below, for all we know it may be that the relief the majority bestows on her will enable her to incur costs that are substantially less than the costs she would incur if she litigated her claims in court, and that Williams will incur costs that are substantially greater than it would incur in a litigation. In that event, Brady would be enriched and Williams would be disadvantaged.

*cf. Gilmer*, 500 US at 31 [noting that "by agreeing to arbitrate, a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration" (internal quotation marks omitted)]).

On the important issue of Brady's "expected costs for litigation and [her] ability to pay those costs" (*Bradford*, 238 F3d at 556 n 5), Brady made no showing at all in Supreme Court. Rather, in an affidavit from her attorney that was before the court, counsel asserted only that he "estimate[d] that the arbitration cost that will be incurred in Brady's dispute with Williams is approximately $30,000 to $35,000 greater at the AAA than it would have been if adjudicated at the NASD." First, this "estimation" is wholly conclusory as it is supported by no factual detail. Second, it is irrelevant whether arbitration before the AAA is more expensive than arbitration before the NASD. Third, and most critically, counsel failed to offer even a conclusory assertion that arbitration before the AAA would be more expensive, let alone prohibitively so, than litigation in court. As is clear from a case the majority cites, this failure alone should be sufficient to reject Brady's claim that prohibitive costs would be visited on her by enforcing the fee-splitting provision (*see James v McDonald's Corp.*, 417 F3d 672, 680 [7th Cir 2005] [rejecting claim by James that high up-front costs of arbitration prohibit her from arbitrating her claims; "James has not provided any evidence concerning the comparative expense of litigating her claims. The cost differential between arbitration and litigation is evidence highly probative to (her) claim that requiring her to proceed through arbitration, rather than through the courts, will effectively deny her legal recourse"]). The majority makes no effort to distinguish *James* in this regard.

On the equally important issue of Brady's ability to pay the arbitration costs, Brady made a clearly inadequate showing in Supreme Court. Apart from a statement by her counsel in a letter to the AAA that was before the court asserting that she had been unemployed since she was terminated by Williams in February 2005, Brady offered statements regarding only her earned income in the preceding years. Thus, the demand for arbitration she submitted to the AAA, which was before the court as an exhibit to an affirmation from her counsel, states that her income from her employment with Williams "grew from $100,000 in 1999, to $137,500 in 2000, to $324,000 in 2001, to

$356,000 in 2002, to $405,000 in 2003" before it dropped to $204,691 in 2004. It is not even clear that Brady swore to the truth of these statements; the copy of the demand in the record on appeal includes an unexecuted verification of the content of the demand. Of course, it is at least conceivable that Brady had income from other sources, such as investments. On this subject, she said nothing. In any event, it is far from obvious that someone whose income totaled more than $1,500,000 from 1999 through 2004 would be unable to pay $21,150, the amount the majority states would be her share of the arbitrator's fee.[8] Furthermore, whether that amount would be probatively expensive should be determined "against a baseline of the claimant's expected costs for *litigation* and h[er] ability to pay those costs" (*Bradford*, 238 F3d at 556 n 5 [emphasis added]), matters regarding which Brady made no showing.

On this issue, moreover, it should be emphasized that Brady also failed to make any showing at all regarding her financial assets. The majority regards as irrelevant the extent of her financial assets; it does not mention this failure in the course of concluding that "Brady adequately carried her burden of demonstrating that she was not in a position to afford the cost associated with the arbitration." Indeed, with respect to Brady's ability to pay half of the arbitration costs, i.e., half of the arbitrator's fees and costs, the majority regards her "long-term unemployment" as dispositive. Under the majority's analysis it does not matter if Brady has hundreds of thousands of dollars in liquid or other assets. When the central issue is the ability to pay of a party resisting enforcement of a fee-splitting provision, it is startling to regard as irrelevant the extent of the party's financial assets. Not surprisingly, this startling view of the law is refuted by the applicable authorities (*see e.g. Dobbins v Hawk's Enters.*, 198 F3d 715, 717 [8th Cir 1999] [rejecting claim by plaintiffs Todd and Stacy Dobbins that arbitration agreement was unenforceable because of fees they were required to pay under AAA rules; "Mr. Dobbins refused to provide his family's financial information to the AAA. This is an important step that must be taken before an unconscionability determination can be made"]).

The majority is correct that I "cannot—and do[ ] not—dispute that the fee-splitting provision with regard to the arbitrator's

---

**8.** The majority errs in taking into account "other arbitration fees and costs that would have to be borne equally by the parties." As discussed above, only the fees and costs of the arbitrator must be shared equally.

compensation requires Brady to bear a substantial cost for submitting her discrimination claims to arbitration." The majority is wrong in maintaining that I "attempt[ ] to minimize the effect of such high cost by making us believe that the alternative litigation cost would be much higher." I have no idea whether the alternative litigation costs would be higher, let alone much higher. My point is that neither I nor the majority knows because Brady made no effort to sustain *her* burden of showing that the cost of arbitration would be prohibitively expensive when "measured against a baseline of [her] expected costs for litigation and [her] ability to pay those costs" (*Bradford*, 238 F3d at 556 n 5). Accordingly, the majority's assertion of the ostensible "fact" that Brady would incur a "substantial arbitration cost relative to litigation" is pure ipse dixit.

The majority also misses the point in going on to argue that

> "[i]t is common knowledge that an employee filing an employment discrimination claim in the federal courts must pay a minimal filing fee, generally only a few hundred dollars. Also, the costs of maintaining and operating the court system, including the salaries of judges and other court employees, are borne by the taxpayers, not the litigants themselves."

The complete answer to this is the one given in *Bradford:*

> "Although the *Cole* court framed its concern with fee-splitting partially in terms of the fact that arbitrators' fees are 'unlike anything that [a claimant] would have to pay to pursue his statutory claims in court' because a claimant normally 'would be free to pursue his claims in court without having to pay for the services of a judge,' *Cole*, 105 F3d at 1484-85, we believe the proper inquiry under *Gilmer* is not where the money goes but rather the amount of money that ultimately will be paid by the claimant. Indeed, we fail to see how a claimant could be deterred from pursuing his statutory rights in arbitration simply by the fact that his fees would be paid to the arbitrator where the overall cost of arbitration is otherwise equal to or less than the cost of litigation in court" (*Bradford*, 238 F3d at 556 [footnote omitted]).

The majority does not and cannot directly take issue with the obvious fact—expressly recognized in cases such as *Bradford* and *Rosenberg*—that arbitration can be less expensive than litigation.[9] The majority, however, does so obliquely by arguing that "[w]hile the employee filing in court is likely to incur the costs of legal representation, her attorneys may be likely to take the case on a contingency fee basis." Putting aside pro bono cases—nothing in the record suggests that this is one—the complainant faces the *certainty* of incurring the costs of legal representation regardless of whether his or her complaint is adjudicated in an arbitral or judicial forum. The majority appears to suggest that those costs are or can be lower in judicial litigation because plaintiffs' attorneys "may be likely" to agree to represent their clients on a contingency fee basis. Nothing but sheer speculation supports the implicit assumption that representation on a contingency fee basis is more likely in litigation than when attorneys represent claimants in arbitration. But even if that were so, it would not get the majority anywhere because it does not follow that the costs of legal representation are for this reason generally lower for claimants than plaintiffs. In any event, what generally may be true is irrelevant as the focus must be on the particular facts of this case (*see Bradford*, 238 F3d at 556 n 5 ["an appropriate case-by-case inquiry must focus upon a claimant's expected or actual arbitration costs and his ability to pay those costs, measured against a baseline of the claimant's expected costs for litigation and his ability to pay those costs"]).[10]

---

**9.** As noted above, in observing that "parties to litigation in court often face costs that are not typically found in arbitration," the *Bradford* court referred specifically to the costs of "longer proceedings and more complicated appeals on the merits" (*Bradford*, 238 F3d at 556 n 5). In New York, parties who arbitrate their disputes do not typically face the costs of discovery proceedings (*see De Sapio v Kohlmeyer*, 35 NY2d 402, 406 [1974]).

**10.** For the same reason the majority's contention that "in general, it cannot be disputed that the out-of-pocket expenses for an employee filing a legal suit are minimal" also is irrelevant. Nonetheless, three points should be made about this contention. First, when attorneys are paid on an hourly basis, there is no reason to suppose that they are less likely to seek a retainer before filing a legal suit as opposed to a demand for arbitration. Second, given the "simplicity, informality, and expedition of arbitration" (*Gilmer*, 500 US at 31 [internal quotation marks omitted]), it is reasonable to suppose that the amount of the initial retainer generally will be lower when an arbitration demand is to be filled. Third, even assuming that the initial out-of-pocket expenses for an employer filing a legal suit are lower when a legal suit is filed,

*(n. cont'd)*

The majority goes on to argue that "if the employee's suit is successful, the remedies available under federal anti-discrimination legislation include the award of attorney's fees." Presumably, the majority is of the view that this substantive remedy is not available to Brady. That is simply not so. In fact, the arbitration agreement expressly provides as follows: "if any party prevails on a statutory claim, which affords the prevailing party attorneys' fees . . . the Arbitrator may award reasonable fees to the prevailing party." Brady alleges in her demand for arbitration that Williams committed various discriminatory and retaliatory acts in violation of federal, state and local laws that do authorize an award of reasonable attorney's fees. To the extent these claims are meritorious—Brady made no showing that they are—that also would undercut rather than support the majority's position that Brady met her burden of showing that the costs of arbitration relative to litigation would be prohibitive.

For these reasons, I agree with Justice Figueroa that Brady "has not proven that the fees . . . are so great that it deprives her of the opportunity to enforce her rights[;] if any thing, the evidence is to the contrary."

## D

Brady's other arguments for affirmative relief can be disposed of readily. In addition to seeking relief under CPLR article 75 against Williams,[11] Brady sought relief under CPLR article 78 against the AAA. Specifically, Brady sought an order directing the AAA to enter an award on default against Williams in the arbitration or, in the alternative, an order directing the AAA to enter such a default award unless Williams paid all the outstanding costs and fees of the arbitration and committed to pay all future costs and fees. The AAA declined to appear, taking the position that arbitrators and arbitral organizations are immune from suits like this one. Justice Figueroa concluded that Brady could not maintain a proceeding under article 78 against the AAA. Although Brady argues on appeal that this Court should reverse and enter an order compelling the AAA to enter a default award against Williams in the event it does not

---

the proper focus is on the "amount of money that ultimately will be paid by the claimant" (*Bradford*, 238 F3d at 556).

11. As Williams' attorney noted during oral argument before Justice Figueroa, Brady was seeking in her petition against Williams what was in effect a motion to compel arbitration.

pay all the arbitration costs, Brady cites to no authority supporting the proposition that she can maintain the proceeding against the AAA and makes no effort to distinguish the decision that Justice Figueroa relied on in ruling to the contrary, *Matter of Snyder-Plax v American Arbitration Assn.* (196 AD2d 872, 875 [1993], *lv denied* 83 NY2d 757 [1994]). In any event, as previously discussed, the linchpin in this argument—that Williams is required to shoulder all the arbitration costs—is meritless.

Finally, Brady requests from this Court alternative relief that she never requested in her petition: that we grant her leave to pursue her claims in "judicial litigation." As Williams correctly argues, we cannot under these circumstances grant that relief (*see Rodrigues v City of New York*, 193 AD2d 79, 88 [1993]; *Recovery Consultants*, 141 AD2d at 276). Any grant of that relief, moreover, would be appropriate only if commencing an action at this juncture would not be time-barred, an issue not briefed by the parties and on which we should not opine. If an action would not be timely, Brady's request would be at best ineffectual. It also would be inappropriate, as Williams has not taken any action that prevented Brady from bringing an action and she apparently chose not to bring an action despite her current position that enforcement of the fee-splitting provision would entail prohibitive costs. If an action would be timely, the relief she seeks is unnecessary.

For these reasons, I would affirm Justice Figueroa's order in all respects.

SWEENY, RENWICK and FREEDMAN, JJ., concur; SAXE, J.P., and McGUIRE, J., dissent in part in an opinion by McGUIRE, J.

Order and judgment (one paper), Supreme Court, New York County, entered July 13, 2007, reversed, on the law, and the petition granted to the extent of directing The Williams Capital Group, L.P., to pay the arbitration fees subject later to reallocation of those costs by the arbitrator.